# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

Anh "Joseph" Cao                                    CIVIL ACTION
**Republican National Committee, and**
**Republican Party of Lousiana**

**VERSUS**                                          **NO. 08-4887**

**Federal Election Commission**                     **SECTION: "C" (2)**

### ORDER AND REASONS

This action under 2 U.S.C. § 437h challenges the constitutionality of provisions of the

Federal Election Campaign Act ("FECA" or "the Act") of 1971, 2 U.S.C. § 431 *et seq*, as

amended by the Bipartisan Campaign Reform Act ("BCRA") of 2002. Section 437h of the Act

assigns to the *en banc* court of appeals the role of decision maker on constitutional challenges.

The district court's task is to determine whether the constitutional challenge is "frivolous." If

the issues are not frivolous, the district court is to make findings of fact and certify the issues to

be resolved to the appellate court. *Khachaturian v. Federal Election Commission*, 980 F.2d.

330, 332 (5th Cir. 1992).

Plaintiffs Anh "Joseph" Cao ("Cao"), the Republican National Committee ("RNC"), and

the Louisiana GOP ("LA-GOP") (hereinafter referred to collectively as "the Cao plaintiffs")

bring the instant eight challenges to several provisions of the Act, contending, *inter alia* that the

Supreme Court has left unresolved questions regarding the constitutionality of contribution and

expenditures limits on political parties. (Rec. Doc. 19).

2 U.S.C. § 437h provides:

The Commission, the national committee of any political party, or any individual

eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

The Fifth Circuit has expressly spoken on this particular statute and has required specific findings by the district court prior to certification. In *Khachaturian v. Federal Election Commission*, the Fifth Circuit remanded a case with certified questions because the district court had failed to develop an adequate factual record. 980 F.2d. 330 (5th Cir. 1992). The Fifth Circuit requires that the district court first determine whether or not the claim is frivolous, and recommends an evidentiary hearing to conduct the inquiry. Second, a district court should a) identify the constitutional issues in the complaint; b) take necessary evidence; c) make findings of fact; d) certify constitutional questions arising from the above. *Id*. at 332 (quoting *Buckley v. Valeo*, 519 F.2d 817, 818 (D.C. Cir.1975)).


## I. Standard of Review

The most thorough discussion of a district court's obligation to assess the contours of the plaintiff's claim before certifying under this statute was set forth by the Ninth Circuit in *Goland v. United States*, 903 F.2d 1247, 1257-58 (9th Cir. 1990). There, a district court refused to certify questions to the Ninth Circuit on the grounds that the constitutional challenges were frivolous, and the circuit court affirmed. *Id.* The court approved a "frivolousness" standard "similar to that of a single judge presented with a motion to convene a three judge court to hear constitutional challenges." *Id.*

Under that standard, a single judge could dismiss constitutional claims which already had

been decided. We believe this is a more appropriate standard. Such a standard may more closely resemble that applied under Rule 12(b)(6) to the failure to state a claim than it does to the frivolousness standard under § 1915(d). . . . Nothing in Rule 12(b)(6) confines its sweep to claims of law which are obviously insupportable. On the contrary, if as a matter of law it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or a close but ultimately unavailing one.

*Id.* at 1258 (citations omitted). The court also noted that "once a statute has been thoroughly reviewed by the [Supreme] Court, questions arising under 'blessed' provisions understandably should meet a higher threshold." *Id.* at 257.

The Cao plaintiffs argue repeatedly that the FEC has inappropriately argued the merits. (Rec. Doc. 76 at 6). Because the Court adopts a standard of review akin to that used in deciding a Rule 12(b)(6) motion, some "merits" review is appropriate; the Court could not effectively assess the "frivolousness" of the claims in the motion to certify without undertaking a thorough review of the controlling law.

What is less certain is the proper role of the Court with respect to reviewing the facts. The *Khachaturian* court remanded because the district court failed to determine whether the plaintiff in that as applied challenge had "demonstrate[d] that the $1,000 limit [on campaign contributions] had a serious adverse effect on the initiation and scope of his candidacy." 980 F.2d at 331. The Fifth Circuit then laid out the steps the court should have taken, which have already been cited above. *Id.* In conclusion, the court advised that

[T]he district court should first determine whether Khachaturian's claim is frivolous in light of *Buckley*. The district court may find it desirable to conduct an evidentiary hearing to assist it in this inquiry. Should the court find that the case is not frivolous, it should proceed to follow the four-step course of action outlined above. If no colorable constitutional claims are presented on the facts as found by the district court, it should dismiss the complaint. If it concludes that colorable constitutional issues *are raised from the facts*, it should certify those questions to us.

3

*Khachaturian*, 980 F.2d at 331 (emphasis added). This quote strongly supports a conclusion that a district court can engage in some amount of factual review. Further, the "four step course of action" indicates that this Court should only certify constitutional questions that *arise from* a combination of the constitutional issues in the complaint and the Court's findings of fact. *Id.* There is little guidance beyond this in the caselaw to determine the appropriate standard of review to apply to those facts. Nonetheless, despite the *Goland* court's conclusion that the proper standard is the 12(b)(6) standard, where "no relief could be granted under any set of facts," 903 F.2d at 1257, such a standard makes little sense in an as applied challenge, where some review of the facts is inherently necessary to determine if a colorable claim has been raised. The Court will therefore proceed using a deferential standard, akin to the 12(b)(6) standard, but per the instructions in *Khachaturian* will only certify those questions that arise out of the Court's review of both the facts and the law.[1] In this case, both parties have submitted extensive findings of fact, and declined the opportunity to have an evidentiary hearing, preferring to proceed with the record before the Court and the briefs.

Further, the FEC has filed a motion for summary judgment. (Rec. Doc. 69). In a motion for summary judgment, the Court goes beyond the pleadings to determine whether there is any genuine issue as to any material fact such that the movant is entitled to judgment as a matter of law. *See Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 477 (5th Cir. 2002).

Because the Court is adopting a "frivolousness" standard that is somewhere between a

---

[1] As will be made clear below, the Court's review of the facts only comes to bear on a limited number of the plaintiffs' challenges. To the extent the Court finds the plaintiffs' challenges foreclosed as a matter of law, it is adopting the *Goland* standard of review, without modification.

motion to dismiss – where no factual review is appropriate – and a motion for summary

judgment – where the Court must review for genuine issues of material fact – it follows that any

question that the Court finds "frivolous" is also appropriate for summary judgment.

Finally, the *Khachaturian* court's instructions suggested that the "frivolousness"

determination was the first step of the district court's review process, followed by a second step,

involving the four step process from *Buckley*. 980 F.2d 330. Both steps, however, involve a

review of the evidence, followed by a determination of whether colorable constitutional claims

have been presented. *Id.* The Court has taken evidence, and its findings of facts are set forth

below. However, rather than engage in the analysis of those facts twice, after identifying the

constitutional issues, the Court will first set forth its findings, and then certify any colorable

constitutional questions that arise out of the facts and complaint as non-frivolous.


## II. Questions Presented for Certification to the *En Banc* Panel of the Fifth Circuit

The Cao plaintiffs ask the Court to certify eight questions:

1. Has each of the plaintiffs alleged sufficient injury to constitutional rights enumerated
in the following questions to create a constitutional "case or controversy" within the
judicial power of Article III?

2. Do the Party Expenditure Provision limits at 2 U.S.C. § 441a(d)(2)-(3) violate the
First and Fifth Amendment rights of one or more plaintiffs in that they are excessively
vague, overbroad, and beyond the authority of Congress to regulate elections as applied
to coordinated expenditures other than (a) communications containing express advocacy,
(b) targeted federal election activity, (c) disbursements equivalent to paying a candidate's
bills, and (d) distributing a candidate's campaign literature?

3. Do the expenditure limits at 2 U.S.C. § 441a(d)(2)-(3) violate the First Amendment
rights of one or more plaintiffs as applied to coordinated expenditures for (a)
communications containing express advocacy and (b) targeted federal election activity?

4. Do the limits on coordinated expenditures 2 U.S.C. § 441a(d)(3) violate the First

Amendment rights of one or more plaintiffs?

(a) Do all but the highest limits violate such rights because any lower rates are unsupported by the necessary anti-corruption interest?

(b) Is 2 U.S.C. § 441a(d)(3) facially unconstitutional because lower rates cannot be severed from higher rates and the voting-age-population formula is substantially overbroad and inherently unconstitutional?

(c) Is the highest limit for expenditures coordinated with Representatives unconstitutionally low?

5.  Do the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) and the Coordinated Contribution Provision at 2 U.S.C. § 441a(a)(7)(B)(i) (treating coordinated expenditures as in-kind "contributions") violate the First and Fifth Amendment rights of one of more plaintiffs in that they are excessively vague, overbroad, and beyond the authority of Congress to regulate elections as applied to coordinated expenditures other than (a) communications containing express advocacy, (b) targeted federal election activity, (c) disbursements equivalent to paying a candidate's bills, and (d) distributing a candidate's campaign literature?

6.  Do the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) and Coordinated Contribution Provision at 2 U.S.C. § 441a(a)(7)(B)(i) (treating coordinated expenditures as "contributions") violate the First Amendment rights of one or more plaintiffs as applied to coordinated expenditures for (a) communications containing express advocacy and (b) targeted federal election activity?

7.  Does the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) violate the First Amendment rights of one or more plaintiffs as applied to a political party's in-kind and direct contributions because it imposed the same limits on parties as on political action committees ("PACs")?

8.  Does the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) facially violate the First Amendment rights of one or more plaintiffs?

(Rec. Doc. 19).


## III.  FACTUAL FINDINGS

*RULINGS ON EVIDENTIARY OBJECTIONS*

As a preliminary matter, the Court notes its limited role as factfinder in this matter for

any questions that are not "frivolous."  The Court has opted to adopt the reasoned approach

followed by Judge Vanaskie in *Mariani v. United States*, 80 F.Supp.2d 352, 362 (M.D.Pa. 1999),

and will provide the circuit court extensive findings, describing in detail the relationship between

political parties, candidates, and donors under the current regulatory system.  The Court further

notes that in the absence of a jury, it is inclined to be overinclusive rather than underinclusive

when presented with close evidentiary disputes, preferring to convey as detailed a record as

possible to the reviewing court.  *See* CHARLES WRIGHT AND ARTHUR MILLER, 9A FED. PRAC. &

PROC. CIV. § 2411 (3d ed.) ("in a nonjury case the court should be slow to exclude evidence

challenged under one of the exclusionary rules").

In their responses to each other's proposed findings of facts, each side raised numerous

objections the other side's claims.  However, the FEC's responses centered on the proper

interpretation of the evidence, not on its admissibility.  The Cao plaintiffs raised numerous

substantive arguments about the facts, and also raised repeated evidentiary objections, which are

addressed below.  The Court's resolution of disputes about the proper interpretation of the facts

will be evident in its findings.  Some proposed findings were legal conclusions or otherwise

insufficiently supported by the record, and have been omitted.

A.  *Relevance, Materiality, and Vagueness*

The Cao plaintiffs assert that many of the FEC's proposed findings are irrelevant to the

instant litigation because they: (1) address campaign contributions, whereas the parties here

contest the constitutionality of limits on expenditures;[2] (2) provide historical narrative and not

---

[2]  This objection was raised as to FEC proposed findings 9-14, and 98.

factual evidence;[3] (3) relate to entities not a party to the case;[4] or (4) do not directly address the claims at issue.[5] They also argue that some of the FEC's quantitative characterizations are misleading without the proper economic context.[6]

The Court has taken all of the above objections into consideration in reaching its Findings of Fact. To the extent proposed facts that are tangential to the instant litigation nonetheless provide useful context for overall campaign finance regulation scheme, the above objections have been overruled. However, to the extent those proposed facts obscure the most relevant issues being put before the appellate court, those objections have been sustained.

B. *Professor Krasno's Testimony*

Jonathan Krasno is an Associate Professor at Binghamton University who has authored an expert report in this litigation. (Jonathan Krasno, Political Party Committees and Coordinated Expenditures in *Cao v. FEC* (Krasno Rept.), FEC Exh. 1). Professor Krasno has published numerous works in the field of political science, many of which involve the role of campaign finance regulation and political parties in United States politics.

The Cao plaintiffs object to Professor Krasno's expert testimony "in so far as he is testifying as to facts and not expressing an opinion as to facts already properly in the record."[7]

_____

[3] This objection was raised as to FEC proposed findings 21-25.

[4] This objection was raised as to FEC proposed findings 8, 9, 11-14, 34, 35, 38-44, 48, 49, 72-77, 90, 92, 107, and 141.

[5] This objection was raised as to FEC proposed findings 15-20, 72-78, 89, 93, 100, 112, 145.

[6] This objection was raised as to FEC proposed findings 31-44, 89, and 149.

[7] This objection was raised as to FEC proposed findings 5, 6, 26-31, 66, 68, 69, 78, 79, 81, 92, 99, 100, 103, 117, 119, 126, 130, 131, 138, 141, 145, and 150-52. (Rec. Doc. 76-2).

(Rec. Doc. 76-2 at 2). Some of the proposed findings based on Professor Krasno's testimony are assertions about historical trends and political motivations, and lack additional supporting evidence in the record. *See, e.g.*, FEC Proposed Finding 28 ("The goal of the RNC [in its inception] was 'survival' and to 'provide[] a vehicle for continuity'"). Experts are, however, permitted to testify as to their opinions regarding facts not in the record. FRE 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing."). The Court will treat these statements as Krasno's opinion, and weigh them accordingly.[8] Some of Krasno's statements, however, are clearly facts. The Court considers many of these to be legislative facts, of which it can take judicial notice. *See* 12 Fed. Proc., L. Ed. § 33:59 ("It has been said generally that 'adjudicative facts' relate specifically to the activities or characteristics of the litigants, as opposed to 'legislative facts,' which are those a court relies upon when it purports to develop a particular law or policy and thus considers material wholly unrelated to the activities of the parties.") Further, the Cao plaintiffs do not object to the content of many of these facts, criticizing only their means of introduction. To the extent Cao's objections raise doubts as to the accuracy of such statements, the Court has not adopted those statements as its findings without additional supporting evidence in the record.

C. *The Biersack, Meehan, and Rozen Declarations*

The Cao plaintiffs argue that the FEC improperly attached these declarations as exhibits to their supplemental briefing on August 31, 2009, even though the discovery cut-off was July 30, 2009. (Rec. Doc. 78-2 at 1). They assert that they are prejudiced by the late filings because

_____

[8] The Cao plaintiffs opted not to depose Krasno or submit an expert report of their own.

they were not afforded an opportunity to depose the declarants or respond to their claims. (Rec. Doc. 78-2 at 2). They also argue that the facts presented by the declarants are adjudicative facts, not legislative facts, and therefore the FEC cannot avoid the above mentioned discovery deadline. (Rec. Doc. 85 at 1-2).

The FEC argues that the declarations are not "discovery" as defined by the Federal Rules of Civil Procedure, and are therefore not subject to the discovery deadlines, and dispute the Cao plaintiffs' characterization of the declaration as containing adjudicative facts. (Rec. Doc. 82 at 2, 4). They also point out that the Cao plaintiffs propounded no discovery requests, so the FEC cannot be said to have withheld requested information. (Rec. Doc. 82).

Legislative facts are typically characterized as "general facts" that "apply universally" and "do not relate specifically to the activities or characteristics of the litigants." *See* 12 Fed. Proc., L. Ed. § 33:59. At issue are a statement by former congressman Martin Meehan (Rec. Doc. 66-4); a statement by Robert Biersack, Special Assistant to the Staff Director for Data Integration at the FEC in which he compiles and describes[9] publicly available data on campaign expenditures and contributions (Rec. Doc. 66-5); and a statement by lobbyist and fundraiser Robert Rozen (Rec. Doc. 66-34). The Court acknowledges that information in these declarations occupies a gray area in between legislative and adjudicative facts: the statements purport to represent activities of candidates and political parties in general, and not those of the litigants in

---

[9] Although the Cao plaintiffs characterize Biersack's declaration as charts plus "commentary," (Rec. Doc. 85 at 4) the words accompanying the data are purely descriptive, and provide no discernable "slant." (Rec. Doc. 66-5).

the instant case.[10]  *See id.*  However, they are certainly disputable and might not "apply universally."  *Id.*

At oral argument on the motion to strike these declarations, the Court indicated its inclination to convey as complete a record as possible to the circuit court, but gave the Cao plaintiffs the opportunity to depose the objected to declarants or submit counter-declarations. They declined this offer, resting on their objection that the statements in the reports were adjudicative rather than legislative facts and improperly before the Court.  The Court therefore holds that admitting these declarations to the record will cause no undue prejudice to the Cao plaintiffs.  The Court DENIES the Cao plaintiffs' motion to strike these exhibits.

## FINDINGS OF FACT

### A.  Background

*The Litigation*

1.  The Cao plaintiffs filed their complaint on November 13, 2008, challenging several provisions of the FECA/BCRA in what the complaint dubbed a successor case to *Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n*, 518 U.S. 604 (1996) (*Colorado I*) and *FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431 (2001) ("*Colorado II*").  (Rec. Doc. 1 at 1).  They filed a Motion for Certificate of Appealability on December 23, 2008 (Rec. Doc. 19).  After oral argument on the motion, the Court ordered an

---

[10]  If this were a facial challenge to the campaign finance statute, there would be a stronger argument that the Meehan declaration, at least, which describes the activity of political parties and candidates, clearly "relates to" the activities of the litigants.  However, as most of the questions presented are as applied challenges and neither Meehan nor the Democratic National Committee are parties, the declaration's designation is more ambiguous.

evidentiary hearing to comply with the Fifth Circuit's requirement in *Khachaturian*. (Rec. Doc. 42).

2. After the close of discovery, the parties jointly moved to convert the scheduled evidentiary hearing to a second argument on the merits of the Motion for Certificate of Appealability and the FEC's cross motion for summary judgment. (Rec. Docs. 69, 72). That argument was heard on November 9, 2009, and taken under submission.

*The Parties*

3. Anh "Joseph" Cao is the United States Representative for the Second Congressional District of Louisiana. (Deposition of Anh "Joseph" Cao (Cao Dep.) at 8, FEC Exh. 4). Cao, a Republican, defeated incumbent Democrat William Jefferson in a general election on December 6, 2008. (Second Amended Verified Complaint for Declaratory and Injunctive Relief ("AVC") ¶ 10 (Rec. Doc. 35)). The election was held in December because primaries had been postponed due to damage from Hurricane Gustav. (Official 2008 Election Results at 113 n.*, http://www.fec.gov/pubrec/fe2008/2008congresults.pdf). (Rec. Doc. 88, Joint Stipulation ("J. Stip.") of the parties at 1-2).

4. This litigation began prior to Cao's election. In his Complaint, Cao indicated that he wanted to participate with RNC and LA-GOP to the maximum extent constitutionally permissible in the activities outlined in the Complaint. (AVC ¶ 10; Deposition of Anh "Joseph" Cao (Cao Dep.) at 13-15, Defendant Federal Election Commission's Proposed Findings of Fact and Statement of

Material Facts as to Which There is No Genuine Dispute (FEC Facts) Exh. 4 (Rec. Doc. 66)). (J. Stip. at 1-2).

5. Cao is "eligible to vote in any election for the office of President," 2 U.S.C. § 437h. (AVC ¶ 10). (J. Stip. at 1). He therefore has standing to bring the instant motion to certify under the requirements of 2 U.S.C. § 437h. ("The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act.").

6. RNC is the national political party committee of the Republican Party. Its headquarters are in Washington, District of Columbia. (AVC ¶ 11). It is an unincorporated association made up of 168 members representing all of the states and territories of the United States. (Federal Rule of Civil Procedure 30(b)(6) Deposition of Republican National Committee witness Thomas J. Josefiak (Josefiak Dep.) at 12, FEC Facts Exh. 5). (J. Stip. at 2).

7. As a national party, RNC has historically participated, and participates today, in electoral and political activities at the federal, state, and local levels. (AVC ¶ 35). (J. Stip. at 2). RNC supports both federal, state, and local candidates. RNC also seeks to advance its core principles–a smaller federal government, lower taxes at all levels of government, individual freedom, and strong national defense – by promoting an issue agenda advocating Republican

positions, electing Republican candidates, and encouraging governance in accord with these Republican views.  (AVC ¶ 35).

8.  RNC's core principles are more fully set out in its party platform, the *2008 Republican Platform*, available at http://www.gop.com/2008Platform/.  (AVC ¶ 36).  (J. Stip. at 3).

9.  LA-GOP is the State committee of the Republican Party for Louisiana.  LA-GOP maintains offices in, among other places, New Orleans and Metairie, Louisiana, which offices are staffed by paid employees.  (AVC ¶ 12).  LA-GOP is governed by the executive committee, consisting of individuals serving on a voluntary basis.  (Fed. R. Civ. P. 30(b)(6) Deposition of Republican Party of Louisiana witness Charles Lee Buckels (Buckels Dep.) at 13-14, FEC Facts Exh. 6).  (J. Stip. at 3).

10.  As a state party, LA-GOP has historically participated, and participates today, in electoral political activities at the state and local levels.  (AVC ¶ 38).  (J. Stip. at 3).  LA-GOP supports both federal and state candidates.  LA-GOP also seeks to advance its core principles–a smaller federal government, lower taxes at all levels of government, individual freedom, and strong national defense–by electing Republican candidates, and encouraging governance in accord with there Republican views.  (AVC ¶ 38).  The purpose of the LA-GOP is to promote the Republican message throughout the state and elect Republican candidates.  (Buckels Dep. 18:1-19:1).

11.  The defendant Federal Election Commission ("Commission" or "FEC") is the independent

agency of the United States with exclusive jurisdiction over the administration, interpretation, and civil enforcement of the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431-55, and other statutes.  The Commission is empowered to "formulate policy" with respect to the Act, 2 U.S.C. § 437c(b)(I); "to make, amend, and repeal such rules ... as are necessary to carry out the provisions of [the] Act", 2 U.S.C. §§ 437d(a)(8), 438(a)(8), 438(d); and to issue written advisory opinions concerning the application of the Act and Commission regulations to any specific proposed transaction or activity, 2 U.S.C. §§ 437d(a)(7), 437f.  The Commission has exclusive jurisdiction with respect to civil enforcement of the Act. 2 U.S.C. § 437c(b)(I).  (J. Stip. at 4).  The Commission's sole office is located in Washington, DC.  (AVC ¶ 13).


**B.  The Treatment of Political Parties under the BCRA/FECA**

12.  The national party committees for the Republican Party are the RNC, the National Republican Congressional Committee (NRCC), and the National Republican Senatorial Committee (NRSC).  (Declaration of Robert W. Biersack (Biersack Decl.) at ¶ 2, FEC Exh. 3). The national party committees for the Democratic Party are the Democratic National Committee (DNC), the Democratic Congressional Campaign Committee (DCCC), and the Democratic Senatorial Campaign Committee (DSCC). (*Id.*)


13.  Jonathan Krasno is an Associate Professor at Binghamton University who has authored an expert report in this litigation.  (Jonathan Krasno, *Political Party Committees and Coordinated Expenditures in* Cao v. FEC (Krasno Rept.), FEC Exh. 1).  Professor Krasno has published numerous works in the field of political science, many of which involve the role of campaign

finance regulation and political parties in United States politics. (*Id.* at *Curriculum Vitae* 1-4).

Professor Krasno also co-wrote an expert report that was explicitly relied upon by the Supreme

Court in *FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431, 470 (2001)

(*Colorado II*) (citing Frank J. Sorauf & Jonathan S. Krasno, *Political Parties and Coordinated*

*Spending* (Sorauf & Krasno *Colorado II* Rept.), FEC Exh. 33).


14.  According to Professor Krasno, political parties "have been strongly advantaged

by the system of financing campaigns." (Krasno Rept. at 1, FEC Exh. 1).


15.  Political parties are able to raise more money, from more sources, than other entities

regulated by the Act, including candidates and other political committees, such as separate

segregated funds of corporations and labor organizations, commonly known as political action

committees (PACs). (2 U.S.C. § 441a(a)).


16.  Political parties also receive special non-monetary benefits in connection with federal

elections. Unlike interest groups, parties have their names next to those of their candidates on

ballots in most states. Major-party nominees are automatically included on the general election

ballot, and the names or symbols of their parties are printed near their names. States also often

run parties' primary elections. (Expert Report of Jonathan S. Krasno and Frank J. Sorauf in

*McConnell v. FEC*, Evaluating the Bipartisan Campaign Reform Act (BCRA) (Krasno and

Sorauf *McConnell* Report) at 25 [DEV 1-Tab 2], FEC Exh. 39; Rebuttal Expert Report of

Donald P. Green in *McConnell v. FEC*, *The Impact of BCRA on Political Parties: A Reply to*

*LaRaja, Lott, Keller, and Milkis* (D. Green *McConnell* Rebuttal Report) at 7-9 [DEV 5- Tab 1],

FEC Exh. 41; Responses and Objections of the Republican National Committee to Defendant

Federal Election Commission's First Requests for Admissions in *McConnell v. FEC* (Resps.

RNC to FEC's First *McConnell* RFA's), Nos. 2, 4, 6 [DEV 12-Tab 10], FEC Exh. 42; Plaintiff

Republican National Committee's Responses and Objections to Defendant Federal Election

Commission's Second Set of Discovery Requests in *RNC v. FEC*, 98-cv-1207 (D.D.C.) (RNC

Resps. to FEC RFA's in *RNC*), Nos. 26, 34, 35 [DEV 68-Tab 35], FEC Exh. 59). "DEV" and

"Tab" citations refer to Defendants' Exhibit Volumes from *McConnell v. FEC*, Civ. No 02-582

(D.D.C.). These documents, which include evidence from the *McConnell* case and other cases,

are part of the record in this litigation pursuant to a Stipulation and Protective Order entered into

by the parties and approved by the Magistrate Judge. (Rec. Doc. 49).


17. Unlike political parties, "[o]ther entities are not entitled to organize the slate of candidates

presented to voters. Other entities do not organize legislative caucuses, assign committee chairs

and members, or elect legislative leadership. . . . Even the largest political action committees

cannot begin to approach the political scope, influence, or depth of electoral support

characteristic of the Republican or Democratic Parties." (Expert Report of Donald P. Green in

*McConnell v. FEC*, Report on the Bipartisan Campaign Reform Act (D. Green *McConnell*

Report) at 8 [DEV 1-Tab 3], FEC Exh. 40).


## C. Relevant Provisions of the BRCA/FECA and their Effects on Parties

*Contributions to Candidates*

18.  Under the Act, individuals, political parties, and other political committees are all limited in the amounts that they can contribute to one candidate in a given election cycle. 2 U.S.C. § 441a(a)(1).  (J. Stip. at 5).

19.  Under the current limits, a federal candidate is limited to $2,400 in contributions from each individual per election ($2,400 in a primary election and an additional $2,400 in the general election).  2 U.S.C. § 441a(a)(1)(A); Price Index Increases for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 74 Fed. Reg. 7435-37 (Feb. 17, 2009). (J. Stip. at 5).

20.  National, state, local and district parties are considered multicandidate political committees under the Act, and therefore each is limited to $10,000 in contributions to one candidate in a given election cycle ($5,000 in the primary and $5,000 in the general election).  2 U.S.C. §§ 441a(a)(2)(A); 2 U.S.C. §§ 431(4), 431(16), 441a(a)(4).  National parties and their Senatorial campaign committees may together contribute up to $42,600 to each Senate candidate in the 2010 election cycle.  2 U.S.C. § 441a(h); 11 C.F.R. §§ 110.2(e)(1), 110.3(b)(2); Price Index Increases for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 74 Fed. Reg. 7435-37 (Feb. 17, 2009).  (J. Stip. at 5).

21.  Candidates can receive contributions from each of the major parties' three national committees, as well as state and local committees (including state committees outside the state in which the candidate is running).  For example, in the 2008 election cycle, one U.S. Senate

candidate received $51,563 in party contributions, and one U.S. House candidate received $98,051, due to the variety of national, state, and local party committees permitted to contribute $5,000 under 2 U.S.C. § 441a(a)(2)(A).  In 2008, other Senate candidates reported receiving party contributions of $46,897, $46,802, and $42,900.  Other 2008 U.S. House candidates reported receiving $57,250, $38,979, and $24,640 in party contributions.  (Biersack Decl. ¶ 17, Tables 24-25, FEC Exh. 3).

22.  The Act's contribution limits apply both to direct contributions of money and in-kind contributions of goods or services.  2 U.S.C. § 431(8)(A).  Expenditures made in coordination with a candidate or her campaign are considered in-kind contributions to the candidate.  2 U.S.C. § 441a(a)(7)(B).

*Contributions to Parties*

23.  Under the Act, the committees established by each national party can together receive up to $30,400 per year from each individual donor in federal contributions (money raised in accord with the restrictions of the Act, also known as "hard money").  In each state, the state, district and local committees of a party can receive up to a combined $10,000 per year from each individual donor.  By contrast, other political committees can receive only $5,000 per year from an individual donor in hard money.  2 U.S.C. § 441a(a)(1); Price Index Increases for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 74 Fed. Reg. 7435-37 (Feb. 17, 2009).

24. Under the Act, the committees established by each national party can together receive up to $15,000 per year from other multicandidate political committees. Multicandidate political committees can themselves receive only $5,000 per year from individuals or other multicandidate political committees. 2 U.S.C. §§ 441a(a)(1)(C), 441a(a)(2); Price Index Increases for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 74 Fed. Reg. 7435-37 (Feb. 17, 2009).

25. State, district and local committees of a party can also receive what are known as "Levin Funds." 2 U.S.C. 441i(b); 11 C.F.R. §§ 300.30-32. These are donations of up to $10,000 per year per donor, and they may come from sources ordinarily impermissible under the Act, such as corporations or labor unions. 11 C.F.R. § 300.31(c). These funds can be used in conjunction with hard money for certain activities that benefit federal candidates, such as generic party voter registration drives, voter identification programs, and get-out-the-vote efforts. 11 C.F.R. § 300.32. No other entity is permitted to receive Levin Funds under FECA. 11 C.F.R. §§ 300.10; 300.32.

26. A national party committee can receive unlimited amounts as transfers from other national party committees (*e.g.*, the RNC can transfer unlimited amounts to the NRCC and vice versa). 2 U.S.C. § 441a(a)(4). A National Party committee can also receive unlimited amounts of hard money as transfers from state, district, and local party committees, and vice versa. 2 U.S.C. § 441a(a)(4). State, district, and local party committees can transfer hard money to one another without limit under the Act. 2 U.S.C. § 441a(a)(4). And candidate campaigns can transfer funds

to national, state, or local committees of political parties "without limitation." 2 U.S.C. § 439a(a)(4). This ability to freely transfer money between, among, and to political committees is available only to party committees and committees affiliated with the same corporation, union or other entity. 2 U.S.C. §§ 441a(a)(1); 441a(a)(2); 441a(a)(5).

27. In 2007 and 2008, the Republican national party committees (RNC, NRSC, and NRCC) transferred a total of $46,176,897 to Republican state committees. In 2007 and 2008, the Democratic national party committees (DNC, DSCC, and DCCC) transferred a total of $116,020,742 to Democratic state committees. (Biersack Decl. ¶ 18, Table 26, FEC Exh. 3).

28. National party committees also receive funding from the federal government for their presidential nominating conventions. 26 U.S.C. § 9008(b). For the 2008 conventions, the convention committees for the Democratic and Republican parties each received payments of $16,356,000 from the United States Treasury. (Both Major Parties to Receive Public Funding for 2008 Convention, http://www.fec.gov/press/press2007/20070626conventions.shtml, FEC Exh. 17).

*Party Expenditures*

29. Expenditures made by parties that are not coordinated with a candidate are considered independent and parties may generally engage in them without limit. *Colorado II*, 533 U.S. at 465; *Colorado I*, 518 U.S. at 618. Party independent expenditures are limited only where the national committee of a political party has been designated as the authorized committee of a

Presidential candidate and the campaign is subject to public financing restrictions.  11 C.F.R. §§ 109.36, 9002.1.

30.  Party coordinated communications are one category of coordinated expenditures that are limited under the Act.  11 C.F.R. § 109.37.

31.  Generally, coordinated expenditures are those that are made in "cooperation, consultation or concert with, or at the request or suggestion of" the candidate or candidate's authorized committee.  11 C.F.R. §§ 109.20, 109.37; *see also* 2 U.S.C. § 431(17).

32.  Party coordinated communications are, by definition, "paid for by a political party committee or its agent."  11 C.F.R. § 109.37(a)(1).  (J. Stip. at 6).

33.  However, under FEC regulations, not every communication is considered a coordinated communication even if it is made in "cooperation, consultation or concert with, or at the request or suggestion of" the candidate or candidate's authorized committee.  Whether a particular communication is considered to be a party coordinated communication is based upon both the conduct of those involved and the content of the communication.  11 C.F.R. § 109.37.  The conduct standard is met if, *e.g.*, "[t]he communication is created, produced, or distributed at the request or suggestion of a candidate," "[t]he communication is created, produced, or distributed after one or more substantial discussions about the communication between the person paying for the communication . . . and the candidate who is clearly identified in the communication," or

the person paying for the communication hires a candidate's vendor or former employee "to create, produce, or distribute" it and in doing so that vendor/employee uses "material" information about "campaign plans, projects, activities, or needs" or shares such information with the payer. 11 C.F.R. §§ 109.21(d)(1)(i)); 109.21(d)(3); 109.21(d)(4)-(5).

34. In 2002, Congress passed the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, which included a provision prohibiting the national parties from receiving or spending any "soft money" – money that was not subject to the limitation or prohibitions of FECA. 2 U.S.C. § 441i(a). (J. Stip. at 7).

35. Prior to the passage of BCRA, the RNC made only limited independent expenditures as compared to the substantial independent expenditures that it has made since the passage of BCRA. (Josefiak Dep. at 70-72, FEC Facts Exh. 5 (recalling only one instance of pre-BCRA independent expenditures)). (J. Stip. at 7).

36. In general, the Act currently allows a national and state committee of a political party each to coordinate spending with a candidate up to $43,700 or $87,300 in races for the House of Representatives, and up to a range of $87,300 to $2,392,400 in races for Senate, and the Act also permitted the national parties to coordinate up to $19,151,200 in the most recent Presidential race. 2 U.S.C. §§ 441a(d)(2)-(3); Price Index Increases for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 74 Fed. Reg. 7435-37 (Feb. 17, 2009); Price Index Increases for Expenditure Limitations, 73 Fed. Reg. 8698 (Feb. 14, 2008). These

coordinated expenditures under the Act are in addition to the $5,000 in contributions that all multicandidate political committees can make pursuant to 2 U.S.C. § 441a(a)(2)(A).  Each candidate may receive coordinated expenditures up to this limit from a national committee, and also coordinated expenditures up to this limit from the relevant state party committee.  11 C.F.R. § 109.33(b).  Thus, each candidate may receive party coordinated expenditures of up to $174,600.

37.  For most candidates for the U.S. House of Representatives, the Act currently allows a national or state committee of a political party to make coordinated expenditures of up to $43,700, in addition to the contributions the party committees may make under 2 U.S.C. § 441a(a)(2)(A).  2 U.S.C. § 441a(d)(3); 11 C.F.R. § 109.33; Price Index Increases for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 74 Fed. Reg. 7435-37 (Feb. 17, 2009).  (J. Stip. at 6).  Each candidate may receive coordinated expenditures up to this limit from a national committee, and also receive coordinated expenditures up to this limit from the relevant state party committee.  11 C.F.R. § 109.33(b). Thus, each such candidate may receive party coordinated expenditures of up to $87,400.

38.  If a candidate for the U.S. House of Representatives is running from a state with only one Congressional district, a national or state committee of a political party can make coordinated expenditures of up to $87,300, in addition to the contributions the party committees may make under 2 U.S.C. § 441a(a)(2)(A). 2 U.S.C. § 441a(d)(3); 11 C.F.R. § 109.33; Price Index Increases for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure

Threshold, 74 Fed. Reg. 7435-37 (Feb. 17, 2009). (J. Stip. at 6). Each candidate may receive coordinated expenditures up to this limit from a national committee, and also coordinated expenditures up to this limit from the relevant state party committee. (11 C.F.R. § 109.33(b)). Thus, each candidate may receive party coordinated expenditures of up to $174,600.

39. For U.S. Senate campaigns, the Act currently allows national or state committees of political parties to make coordinated expenditures in amounts ranging from $87,300 to $2,392,400, depending upon the voting age population of the state, in addition to the contributions the party committees may make under 2 U.S.C. § 441a(a)(2)(A). 2 U.S.C. § 441a(d)(3); 11 C.F.R. § 109.33; Price Index Increases for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 74 Fed. Reg. 7435-37 (Feb. 17, 2009). (J. Stip. at 6). Each candidate may receive coordinated expenditures up to this limit from a national committee, and also receive coordinated expenditures up to this limit from the relevant state party committee. (11 C.F.R. § 109.32(b)). Thus, Senate candidates may receive party coordinated expenditures in amounts ranging from $174,600 to $4,784,800.

40. National committees and state committees of political parties can assign their authority to make coordinated party expenditures to other political party committees under 2 U.S.C. § 441a(d)(3). 11 C.F.R. § 109.33(a). (*See also* Nov. 12, 2008 Letter from Roger Villere, Jr., Chairman of LAGOP to Mike Duncan, Chairman of RNC (LA-GOP0001), FEC Facts Exh. 13 (authorizing RNC to make LA-GOP's coordinated expenditures in 2008 Cao campaign); RNC Spreadsheet for 2008 Cao Campaign (RNC 0000001), FEC Facts Exh. 14 (indicating that

coordinated expenditure limit for 2008 Cao campaign increased from $42,100 to $84,200 following receipt of authorization from LA-GOP)). (J. Stip. at 6-7). This allows a candidate to receive the maximum coordinated expenditures that the state and national parties are permitted to make even though "the state parties do not have sufficient federal resources in a lot of the smaller states to be able to fully fund a coordinated expenditure program." (Federal Rule of Civil Procedure 30(b)(6) Deposition of Republican National Committee witness Thomas J. Josefiak (RNC 30(b)(6) Dep.) at 63, FEC Exh. 5).

41. Due to the restrictions on coordinated expenditures, LA-GOP typically assigns its coordinated expenditure amounts to the RNC in order to increase the efficiency and effectiveness of the limited funds. (Buckels Dep. at 35-36, FEC Exh. 6). (J. Stip. at 7).

42. The party coordinated expenditure provisions are adjusted for inflation each year. 2 U.S.C. § 441a(c)(1)(B). (J. Stip. at 6).

43. Political parties are permitted to make coordinated expenditures with their federal candidates in excess of the contribution limits that apply to all multicandidate political committees. 2 U.S.C. §§ 441a(d)(2)-(3). Neither other political committees nor individuals can engage in such coordinated expenditures in excess of their contribution limits.

44. Prior to 90 days before a Congressional or Senate election, or 120 days before a Presidential election, a party communication is not deemed coordinated with a candidate unless it

"disseminates, distributes, or republishes . . . campaign materials prepared by a candidate, …" or "expressly advocates the election or defeat of a clearly identified candidate." 11 C.F.R. §§ 109.37(a)(2)(i)-(ii). No other party communications made prior to the 90/120 day windows count against the Act's limits on party contributions or party coordinated expenditures.

45. Even within the 90 or 120 days immediately before an election, a party communication is not considered a party coordinated communication subject to the Act's limits unless it refers to a clearly identified federal candidate and is disseminated within that candidate's jurisdiction. 11 C.F.R. § 109.37(a)(3).

46. A party communication also is not considered coordinated unless the party and candidate have engaged in specific conduct indicating coordination, even if the communication is disseminated within 90 or 120 days before an election and refers to a clearly identified federal candidate in the appropriate jurisdiction. 11 C.F.R. §§ 109.37(a)(3), 109.21(d)(1)-(6). The conduct standard is met if, *e.g.*, "[t]he communication is created, produced, or distributed at the request or suggestion of a candidate," "[t]he communication is created, produced, or distributed after one or more substantial discussions about the communication between the person paying for the communication . . . and the candidate who is clearly identified in the communication," or the person paying for the communication hires a candidate's vendor or former employee "to create, produce, or distribute" it and in doing so that vendor/employee uses "material" information about "campaign plans, projects, activities, or needs" or shares such information with the payer. 11 C.F.R. §§ 109.21(d)(1)(i)); 109.21(d)(3); 109.21(d)(4)-(5).

47.  The Act provides special exemptions to the definitions of contributions and expenditures for parties, which means some party activities are not subject to any contribution limit.  Payment of compensation for legal or accounting services by full-time staff on behalf of any political party committee or candidate is excluded from these definitions.  2 U.S.C. §§ 431(8)(B)(viii)(I); 431(9)(B)(vii)(I)&(II).  The Act also excludes, for parties and candidates, the use of real or personal property, such as a community room, and the costs of invitations, food, and beverages voluntarily provided by an individual to any political committee, provided that the value of an individual's activity does not exceed $2,000 in any calendar year.  2 U.S.C. § 431(8)(B)(ii).  The Act excludes from the definition of contribution for parties and candidates the payment of travel expenses incurred by any individual on behalf of the candidate or party, as long as the cumulative value of the expenses incurred by an individual does not exceed $1,000 for a candidate and $2,000 for a political party for any calendar year.  2 U.S.C. § 431(8)(B)(iv).  State and local parties may pay for the costs of some communications, such as slate cards, sample ballots, or other materials distributed by volunteers, without regard to the contribution and expenditure limits, even if those activities are coordinated with candidates.  2 U.S.C. §§ 431(8)(B)(v); 431(9)(B)(iv); *Coordinated and Independent Expenditures*, 68 Fed. Reg. 421, 449 (Jan. 3, 2003).  The Act also excludes, for state and local parties, expenditures for certain campaign materials, as well as certain voter registration and get-out-the-vote activities.  2 U.S.C. §§ 431(9)(B)(viii)-(ix).  Certain transfers of payments received by political party committees as a condition of ballot access are also excluded from the definition of "expenditure."  2 U.S.C. § 431(9)(B)(x).

48.  A party can avoid having a communication deemed a coordinated communication by setting up and distributing a written "firewall" policy that prohibits the flow of information between the individuals "providing services for the [party] paying for the communication" and the individuals who are "currently or [were] previously providing services to the candidate who is clearly identified in the communication [or his or his opponent's committee]."  11 C.F.R. §§ 109.37(a)(3), § 109.21(h).

49.  Because the RNC has a continuous and ongoing relationship with its candidates, special measures must be taken to do independent expenditures regarding its candidates.  The RNC has extensive discussions with its candidates about their needs, activities and strategy.  As a result, activities by the RNC about its candidates may be deemed to be coordinated with its candidates, subjecting these activities to the FECA's coordinated expenditure and contribution limits.  In order to engage in any independent expenditure supporting one of its candidates, the RNC may hire an outside consulting group to do the independent expenditures but neither the RNC nor any of its officers, employees or agents may have any involvement in the independent expenditure in order for it to be truly independent.  (Josefiak Dep. 58:6-60:12, 70:13-17, 72:19-73:6, 153:22-155:4, 160:14-161:7).  In fact, neither the chairman of the RNC nor any of the RNC's officers, employees or agents has control over the message of an independent expenditure yet the RNC bears responsibility for that message.  The RNC makes its independent expenditures in this way out of a belief that there is no way to have a true "firewall policy."  (Josefiak Dep. 159:12-18).

50.  Some party committee officials and candidates have expressed dissatisfaction with party

independent expenditures due to their lack of control over the content. (RNC 30(b)(6) Dep. at 72-73, FEC Exh. 5 (describing independent expenditure in Tennessee Senate race that "caused the chairman angst" due to media scrutiny); Cao Dep. at 34-35, FEC Exh. 4 (describing campaign's frustration because NRCC independent expenditure robocalls were "hurting us more than [they] helped us"); Krasno Rept. at 5-6 & n.4, FEC Exh. 1 (describing NRCC chairman's dismay at an inability to do anything about a misleading NRCC independent expenditure alleging an opponent called a phone sex line while traveling on business)). As a result, the RNC is reluctant to conduct independent expenditures. (Josefiak Dep. 74:16- 76:11, 157:9-158:20.

51. Due to the perceived administrative and content advantages of coordinated expenditures, plaintiffs generally prefer to coordinate activities between candidates and parties. (RNC 30(b)(6) Dep. at 57, FEC Exh. 5 ("no chairman feels that independent expenditures is a preferable way to spend money."); LA-GOP 30(b)(6) Dep. at 79, FEC Exh. 6 ("Any coordination with our candidates is something we would like to do more of."); Cao Dep. at 42, FEC Exh. 4 ("I would like for them to do more radio ads, do more mailing of products on my behalf. But before they do it, I would like to know the contents of those ads … .")).

52. So-called "issue advocacy" has been used extensively in connection with federal elections. Prior to 2002, political party communications that did not contain "magic words" such as "Elect John Smith" or "Vote Against Jane Doe" were considered "issue advocacy" and could be financed in part with soft money even if they focused on specific candidates, allowing parties to

use money that was not subject to the Act's source and amount limitations.[11]  *McConnell*, 540

U.S. at 126; (Krasno and Sorauf *McConnell* Report at 50-66 [DEV 1-Tab 2], FEC Exh. 39).

These "issue ads" typically avoided using "magic words" by "condemn[ing] Jane Doe's record

on a particular issue before exhorting viewers to call Jane Doe and tell her what you think."

*McConnell*, 540 U.S. at 127 (internal quotation marks and footnote omitted).  In fact, campaigns

would rarely use such "magic words" anyway.  *McConnell*, 251 F. Supp. 2d at 529 (Kollar-

Kotelly, J.) ("The uncontroverted testimony of political consultants demonstrates that it is

neither common nor effective to use the 'magic words' of express advocacy in campaign

advertisements.").  "[T]he overwhelming majority of modern campaign advertisements do not use

words of express advocacy, whether they are financed by candidates, political parties, or other

organizations."  *Id.*  Thus, although deemed "issue ads" under the law, in practice issue ads and

express advocacy for candidates were "functionally identical in important respects."  *McConnell*,

540 U.S. at 126 ("[b]oth were used to advocate the election or defeat of clearly identified federal

candidates, even though the so-called issue ads eschewed the use of magic words").


53.  Thus, prior to BCRA – when national parties were permitted to receive soft money –

"genuine issue advocacy on the part of political parties [was] a rare occurrence."  *McConnell*,

251 F. Supp. 2d at 451 (Kollar-Kotelly, J.).  Similarly, the RNC spent only "a minuscule

percentage" of its soft money budget on state and local governmental affairs.  *Id*. at 463.  "What

is clear from the evidence [in *McConnell*], however, is that regardless of whether or not it is

---

[11]    The Court will at times throughout these findings include previous findings and
holdings of the Supreme Court to provide context for related findings of fact and a description of
controlling law.

done to advocate the party's principles, the Republican Party's primary goal is the election of its candidates who will be advocates for their core principles." *Id.* at 470.

54. The "conclusion that [issue] ads were specifically intended to affect election results was confirmed by the fact that almost all of them aired in the 60 days immediately preceding a federal election." *McConnell*, 540 U.S. at 127 (footnote omitted).

55. BCRA prevented national parties from spending millions of dollars of soft money running candidate-focused "issue ads" in the days before an election, because national parties could now only receive and spend hard money and because BCRA treats coordinated electioneering communications as coordinated communications subject to contribution limits. (2 U.S.C. §§ 441a(a)(7)(C); 441i(a); 11 C.F.R. §§ 109.37(a)(3); 109.21(c)(4) (public communication in the 90-day or 120-day windows is coordinated if it, *inter alia*, "refers to a clearly identified … candidate")). Prior to BCRA, independent expenditures, which can contain express advocacy, had "remained limited" because national parties could use so-called issue advocacy for "unlimited commercials (mostly) criticizing or (less often) praising a congressional candidate in the days before an election." (Krasno Rept. at 10, FEC Exh. 1; *Colorado II*, 533 U.S. at 455 (independent expenditures may contain express advocacy because "[a] party may spend independently every cent it can raise wherever it thinks its candidate will shine, on every subject and any viewpoint.")). For example, in the 2000 and 2002 election cycles, the national party committees spent less than $2 million per election cycle on independent expenditures while spending "several hundred million dollars on issue advocacy." (Biersack Decl. at ¶ 11, Table 15,

FEC Exh. 3; Krasno Rept. at 10 and n.14, FEC Exh. 1).  But after BCRA limited parties' ability to engage in unlimited coordinated so-called issue advocacy, "the parties turned immediately back to independent expenditures."  (Krasno Rept. at 10 FEC Exh. 1; RNC 30(b)(6) Dep. at 96, FEC Exh. 5 ("Q. Does the RNC usually make independent expenditures to support or oppose Congressional candidates? A. It has been doing so post BCRA.")).  Parties began to spend hundreds of millions of dollars per election cycle on independent expenditures.  (Biersack Decl. at ¶ 11, Table 15, FEC Exh. 3; Krasno Rept. at 10, FEC Exh. 1 ("Spending on independent expenditures skyrocketed to $73 million in 2004 and $154 million in 2006 on House elections.")).

56.  Political parties can currently use independent expenditures for any type of campaign activity, but parties use them overwhelmingly for media advertising, primarily consisting of television advertisements.  (Krasno Rept. at 11 & n.15, FEC Exh. 1).  Prior to the passage of BCRA, "[e]stimates from party officials of the amount of money going to television went as high as 75 percent at the DCCC." (Expert Report of David B. Magleby, Report Concerning Interest Group Election Advocacy and Party Soft Money Activity at 42 [DEV 4-Tab 8], FEC Exh. 55 (footnote omitted)).

**D.  Recent Fund-Raising, Contribution, and Expenditure Levels for Political Parties**

57.  From 1992 to 2006, political party spending "increased tenfold."  (Krasno Rept. at 20-21, FEC Exh. 1).

58.  Data shows that the Democratic and Republican parties together raised more than $1.4 billion in the two-year 2004 election cycle, more than $1 billion in the 2006 cycle, and more than $1.5 billion in the 2008 cycle.  (Biersack Decl. ¶ 6, Table 5, FEC Exh. 3).

59.  In the 2007-2008 election cycle, the national parties raised more money than in the election cycles prior to the effective date of the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, when they were also able to raise "soft" money – money that was not subject to the limitation or prohibitions of FECA.  (Biersack Decl. ¶ 3, Tables 1 & 2, FEC Exh. 3).

60.  In the 2008 election cycle, the major national party committees (RNC and DNC) supported their federal candidates with a total of $529,262 in contributions, $31,256,379 in coordinated expenditures, and $54,563,499 in independent expenditures.  During this same period, the national Senatorial committees (NRSC and DSCC) supported their federal candidates with a total of $648,095 in contributions, $5,353,546 in coordinated expenditures, and $112,013,708 in independent expenditures.  During this same period, the national Congressional committees (NRCC and DCCC) supported their federal candidates with a total of $680,817 in contributions, $5,074,523 in coordinated expenditures, and $112,612,969 in independent expenditures.  During this same period, candidates for the U.S. House of Representatives spent a total of $949,700,00 on their candidacies, and candidates for the U.S. Senate spent a total of $444,700,000 on their candidacies.  (Biersack Decl. ¶¶ 8, 12, 15, Tables 6-9, 16, FEC Exh. 3).

61.  In each of the last five two-year election cycles, the Republican national party committees

(the RNC, NRSC and NRCC) have raised hundreds of millions of dollars of hard money. (Biersack Decl. ¶ 3, Table 1, FEC Exh. 3). In the 2000 election cycle, the Republican national party committees raised $361,588,430 of hard money. (*Id.*) In the 2002 election cycle, the Republican national party committees raised $352,876,067 of hard money. (*Id.*) In the 2004 election cycle, the Republican national party committees raised $657,113,369 of hard money. (*Id.*) In the 2006 election cycle, the Republican national party committees raised $508,120,158 of hard money. (*Id.*) In the 2008 election cycle, the Republican national party committees raised $640,308,267 of hard money. (*Id.*) (FEC Fact 34).

62. In each of the last five two-year election cycles, the Democratic national party committees (the DNC, DSCC and DCCC) have raised hundreds of millions of dollars of hard money. (Biersack Decl. ¶ 3, Table 2, FEC Exh. 3). In the 2000 election cycle, the Democratic national party committees raised $212,880,651 of hard money. (*Id.*) In the 2002 election cycle, the Democratic national party committees raised $162,325,003 of hard money. (*Id.*) In the 2004 election cycle, the Democratic national party committees raised $586,244,028 of hard money. (*Id.*) In the 2006 election cycle, the Democratic national party committees raised $392,089,836 of hard money. (*Id.*) In the 2008 election cycle, the Democratic national party committees raised $599,113,650 of hard money. (*Id.*)

63. In each of the last five two-year election cycles, Republican state and local party committees, in the aggregate, have raised well over $100 million of hard money. (Biersack Decl. ¶ 5, Table 4, FEC Exh. 3). In each of the last five election cycles, Democratic state and local

party committees, in the aggregate, have also raised well over $100 million of hard money.  (*Id.*)

64.  In the 2008 Presidential campaign, national committees of political parties were permitted to make coordinated expenditures with their candidates of up to $19,151,200, in addition to the contributions the party committees may make under 2 U.S.C. § 441a(a)(2)(A). 2 U.S.C. § 441a(d)(2); 11 C.F.R. § 109.33; Price Index Increases for Expenditure Limitations, 73 Fed. Reg. 8698 (Feb. 14, 2008).  (J. Stip. at 7).

65.  In the 2008 election cycle, Republican party committees (including national, state, and local committees) supported their federal candidates with $31,952,985 in coordinated expenditures, and Democratic party committees (including national, state, and local committees) supported their federal candidates with $37,988,558 in coordinated expenditures.  In the 2006 election cycle, six candidates for U.S. Senate each received $1 million or more in coordinated expenditures from their parties.  (Biersack Decl. ¶ 11, 14, Tables 14, 21, 22, FEC Exh. 3).

66.  In the 2008 cycle, the six national party committees provided significant support to their candidates in contributions.  The Republican national committees contributed $1,286,809 to their federal candidates.  The Democratic national committees contributed $571,365 to their federal candidates.  (Biersack Decl. ¶ 12, Table 16, FEC Exh. 3).

67.  During each of the last five two-year election cycles, the Republican national party committees have made millions of dollars of expenditures in coordination with federal

candidates, from a low of $13,310,534 in the 2006 cycle to a high of $29,807,792 in the 2008 cycle.  (Biersack Decl. ¶ 8, Table 6, FEC Exh. 3).

68.  Over each of the last five two-year election cycles, the Democratic national party committees have made millions of dollars of expenditures in coordination with federal candidates, from a low of $2,333,942 in the 2002 cycle to a high of $22,914,903 in the 2004 cycle.  (Biersack Decl. ¶ 8, Table 8, FEC Exh. 3).

69.  In the 2008 cycle, parties made $280,873,688 in independent expenditures.  The Democratic party committees spent $156,191,039 and the Republican party committees spent $124,682,649 in independent expenditures.  (Biersack Decl. ¶ 11, Table 15, FEC Exh. 3).

70.  During the last three two-year election cycles, both major parties' national committees have averaged well over $100 million in independent campaign expenditures.  Republican national party committees made $84,906,626 of independent expenditures in 2004, $115,241,737 of independent expenditures in 2006, and $123,416,207 of independent expenditures in 2008.  (Biersack Decl. ¶ 8, Table 7, FEC Exh. 3).  Democratic national party committees made $175,982,712 of independent expenditures in 2004, $106,745,614 of independent expenditures in 2006, and $155,773,969 of independent expenditures in 2008.  (Biersack Decl. ¶ 8, Table 9, FEC Exh. 3).  During those same cycles, both major parties' state and local committees also spent millions of dollars on independent expenditures.  The Republican state and local parties spent $1,266,442 in 2008, $404,650 in 2006, and $3,125,756 in 2004.  The Democratic state and local

party committees spent $417,070 in 2008, $1,354,651 in 2006, and $508,984 in 2004. (Biersack Decl. ¶ 10, Table 12-13, FEC Exh. 3).

**E.  The Relationship between National and State Parties, Candidates, and Donors**

*The Role of Political Parties*

71.  National political parties are "'inextricably intertwined with federal officeholders and candidates.'" (*McConnell v. FEC*, 540 U.S. 93, 155 (2003) (quoting 148 Cong. Rec. H409 (Feb. 13, 2002))).  "Candidates are the rallying points for the party."  (Krasno Rept. at 5, FEC Exh. 1).

72.  The Supreme Court has found that "'there is no meaningful separation between the national party committees and the public officials who control them.'" (*McConnell*, 540 U.S. at 155 (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 468-69 (D.D.C. 2003) (Kollar-Kotelly, J.))).

73.  The RNC has "constant contact" with candidates at the height of an election.  (Josefiak Dep. at 37, FEC Facts Exh. 5).  (J. Stip. at 2).

74.  "The President typically controls his party's national committee, and once a favorite has emerged for the presidential nomination of the other party, that candidate and his party's national committee typically work closely together." *McConnell v. FEC*, 251 F. Supp. 2d 176, 697 (D.D.C. 2003) (Kollar-Kotelly, J.).  (J. Stip. at 3).

75.  Party organizations, particularly those at the national level, directly assist federal candidates

by providing them with campaign contributions, coordinated expenditures, and assistance in areas of campaigning that require expertise and in-depth research.  They also help candidates raise funds and campaign support from other groups.  The parties' close involvement in political campaigns gives them a special relationship with candidates.  (RNC Resps. to FEC's First *McConnell* RFA's, Nos. 17 – 19, 55 [DEV 12-Tab 10], FEC Exh. 42).

76.  Party organizations recruit candidates and write the rules that govern nomination campaigns. Party organizations also assist general election candidates with their campaigns, providing many with money, political expertise, media and other election services, volunteers, and some of the other resources that are needed to wage an election campaign.  Parties also help candidates collect money and other campaign resources from interest groups and individuals who are active in politics.  In addition, party organizations communicate messages designed to benefit a party's entire ticket or intended to help individual candidates win their races.  (D. Green *McConnell* Rebuttal Report at 7-9 [DEV 5-Tab 1], FEC Exh. 41; Declaration of Rocky Pennington in *McConnell v. FEC* ¶ 5 [DEV 8-Tab 31], FEC Exh. 43; Declaration of Linda W. Chapin in *McConnell v. FEC* ¶ 5 [DEV 6-Tab 12], FEC Exh. 44; Declaration of Terry S. Beckett in *McConnell v. FEC* ¶ 5 [DEV 6-Tab 3], FEC Exh. 45).

77.  One historic role that parties have played is to continue to operate between elections so that each new candidate campaign need not start from scratch.  Parties have historically been considered "socializing institutions that help bring citizens into the political system, serve as an outlet for their political energy by recruiting them to work in campaigns, and help mobilize

voters." (Krasno Rept. at 7, FEC Exh. 1).

78. The strength of a political party can be judged not only by its finances, but also by its "organizational presence in a locale fueled by a combination of paid employees and, more likely, activists and other party members" and the "attention and energy of party members." (Krasno Rept. at 8, FEC Exh. 1).

*Parties Direct their Resources Strategically to have Maximum Impact*

79. Political parties "try to maximize their impact by working hardest in – or targeting– the races they deem closest." (Krasno Rept. at 19, FEC Exh. 1). Parties "try to spend less on uncompetitive races in order to spend more on competitive ones." (*Id.*)

80. Political parties "allocate[ ] money based on a number of factors, including 'the financial strength of the campaign,' 'what [the candidate's] poll numbers looked like,' and 'who had the best chance of winning or who needed the money most.'" *Colorado II*, 533 U.S. at 478 (quoting, *inter alia*, declaration of Robert Hickmott, former Democratic fundraiser and National Finance Director for Timothy Wirth's Senate campaign, in *Colorado II* (Hickmott *Colorado II* Decl.), [DEV 76-Tab 121], FEC Exh. 34). "[T]he primary consideration in allocating funds is which races are marginal – that is, which races are ones where party money could be the difference between winning and losing . . ." *FEC v. Colorado Republican Fed. Campaign Comm.*, 41 F. Supp. 2d 1197, 1203 (1999) (Nottingham, J.).

81.  The RNC decides to spend money in particular races primarily based upon "how competitive the race is and the commitment that the National Committee wants to make to making its position known in that race."  (RNC 30(b)(6) Dep. at 55-56, FEC Exh. 5).  The RNC does not spend money on states that are considered uncompetitive, for example if "there is no chance that the RNC is going to be able to win any of the races, and it's just taking away money from one competitive state and giving it to a state that won't have any impact on."  (*Id.* at 27-28). The RNC also does not spend money in races unless it is convinced that the Republican running is "a legitimate candidate."  (*Id.* at 78).

82.  As a result of their focus on close races, party committees like the RNC rarely reach their legal limit for coordinated expenditures in a particular House or Senate race.  There are 435 seats in the U.S. House of Representatives, each of which is filled by an election during every two-year election cycle.  U.S. Const. art. I, § 2; 2 U.S.C. § 2.  There are 100 seats in the U.S. Senate, and one third of the total Senate membership is elected every two-year election cycle.  U.S. Const. art. I, § 3.  Although there are at least 468 federal elections each cycle, Republican committees reached the maximum amount of coordinated expenditures in only seven congressional races in 2008, and in two races in 2006.  (Biersack Decl. at ¶ 13, Tables 17 & 18, FEC Exh. 3). Democratic committees only reached the legal limit in ten congressional races in 2008 and twelve races in 2006.  (*Id.*)

83.  Parties make no coordinated expenditures at all in many federal elections.  In 2008, only 99 Republican candidates for Congress received coordinated expenditures from political parties,

and in 2006 only 88 did. (Biersack Decl. at ¶ 13, Tables 17-18, FEC Exh. 3). Democratic party committees only made coordinated expenditures for 168 of their congressional candidates in 2008 and 201 of them in 2006. (*Id.*).

84. In only a small fraction of races do party committees spend 95% or more of the coordinated expenditures available to them under the Act. Republican committees only reached the 95% threshold in coordinated expenditures in 61 congressional races in 2008, and in 54 races in 2006. (Biersack Decl. at ¶ 13, Tables 17 & 18, FEC Exh. 3). Democratic committees only reached the 95% standard in 30 congressional races for each of the last two election cycles. (*Id.*)

85. Party committees typically reach the 95% threshold only in the most competitive races. The Cook Political Report is a newsletter that assesses the competitiveness of various elections. (About the Cook Report, http://www.cookpolitical.com/node/1774, FEC Exh. 19 ("The Cook Political Report is an independent, non-partisan newsletter that analyzes elections and campaigns for the US House of Representatives, US Senate, Governors and President as well as American political trends.")). Cross-referencing Republican party spending to the 95% threshold with the Cook Report analysis of 2008 House and Senate races (October 23, 2008) shows that:

a. Republican committees reached the threshold in 29 of 36 "Toss up" races (81%). (Biersack Decl. at ¶ 14, Table 19, FEC Exh. 3; 2008 Competitive House Race Chart (Oct. 23, 2008) (Cook House Chart), FEC Exh. 20, http://www.cookpolitical.com/charts/house/competitive_2008-10-23_11-33-46.php; 2008 Senate Race Ratings (Oct. 23, 2008) (Cook Senate Chart), FEC Exh. 21,

http://www.cookpolitical.com/charts/senate/raceratings_2008-10-23_11-37-46.php).

      b.  Republican committees reached the threshold in 9 of 15 "Lean Democratic" races (60%).  (Biersack Decl. at ¶ 14, Table 19, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

      c.  Republican Committees reached the threshold in 9 of 16 "Lean Republican" races (56%).  (Biersack Decl. at ¶ 14, Table 19, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

      d.  Republican Committees reached the threshold in 4 of 18 "Likely Democratic" races (22%).  (Biersack Decl. at ¶ 14, Table 19, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

      e.  Republican Committees reached the threshold in 3 of 21 "Likely Republican" races (14%).  (Biersack Decl. at ¶ 14, Table 19, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

      f.  Republican Committees reached the threshold in 7 of 364 of races judged as not competitive nor likely to become competitive (2%).  (Biersack Decl. at ¶ 14, Table 19, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

86.  Cross-referencing Democratic spending to the 95% threshold with the Cook Report analysis of 2008 House and Senate races (October 23, 2008) shows that:

      a.  Democratic committees reached the threshold in 10 of 36 "Toss up" races (28%). (Biersack Decl. at ¶ 14, Table 20, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

b. Democratic committees reached the threshold in 1 of 15 "Lean Democratic" races (13%). (Biersack Decl. at ¶ 14, Table 20, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

c. Democratic committees reached the threshold in 6 of 16 "Lean Republican" races (38%). (Biersack Decl. at ¶ 14, Table 20, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

d. Democratic committees reached the threshold in 2 of 18 "Likely Democratic" races (11%). (Biersack Decl. at ¶ 14, Table 20, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

e. Democratic Committees reached the threshold in 4 of 21 "Likely Republican" races (14%). (Biersack Decl. at ¶ 14, Table 20, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

f. Democratic Committees reached the threshold in 6 of 364 of races judged as not competitive nor likely to become competitive (2%). (Biersack Decl. at ¶ 14, Table 20, FEC Exh. 3; Cook House Chart, FEC Exh. 20; Cook Senate Chart, FEC Exh. 21).

87. The majority of 2008 House and Senate general elections were not close, and in those races, party coordinated expenditures were rare. In 322 of the 470 general elections (69%), a candidate received over 60% of the vote. (Official Election Results for U.S. Senate/Official Election Results for U.S. House of Representatives (Official 2008 Election Results), http://www.fec.gov/pubrec/fe2008/2008congresults.pdf). Despite the fact that the majority of races involved a candidate receiving over 60% of the vote, such races only made up a tiny

minority of races in which the Republican or Democratic parties spent 95% or more of the coordinated expenditures available to them under the Act. Of the 61 races in which Republican party committees reached the 95% threshold, only two races (3%) featured a candidate who received over 60% of the vote. (Biersack Decl. at ¶ 14, Table 19, FEC Exh. 3; Official 2008 Election Results). Of the 30 races in which Democratic party committees reached the 95% threshold, only three races (10%) featured a candidate who received over 60% of the vote. (Biersack Decl. at ¶ 14, Table 20, FEC Exh. 3; Official 2008 Election Results).

*Party Committees Facilitate Their Largest Donors' Access to Federal Candidates and Officeholders*

88. Martin Meehan was a Democratic Congressman from Massachusetts between 1993 and 2007, and he has provided a declaration in this case. (Declaration of Martin Meehan (Meehan Decl.) at ¶ 1, FEC Exh. 2). Congressman Meehan stated that "[p]arty fundraising serves as a mechanism for major donors to get special access to lawmakers." (*Id.* at ¶ 8).

89. "At the request of the party, Members of Congress call prospective donors from lists provided by the party to ask them to participate in party events, such as [DCCC or DNC] dinners." (Meehan Decl. at ¶ 9, FEC Exh. 2). National parties' "fundraising events often [] feature members of Congress as draws, and they explicitly offer donors the opportunity to meet and get to know various officials." (Krasno Rept. at 5, FEC Exh. 1 (footnote omitted)).

90. Prior to the passage of BCRA in 2002, large donations often provided access for those donors to federal officeholders. (*McConnell*, 540 U.S. at 150-52 ("The record in the present

case[] is replete with . . . examples of national party committees peddling access to federal candidates and officeholders in exchange for large soft-money donations. . . . [T]he RNC holds out the prospect of access to officeholders to attract soft-money donations and encourages officeholders to meet with large soft-money donors.") (citing *McConnell*, 251 F. Supp. 2d at 500-03 (Kollar-Kotelly, J.), 860-61 (Leon, J.)).

91.  Notably, though, the RNC does not accept earmarked contributions, as defined in 11 C.F.R. § 110.6, for any particular candidate.  (Josefiak Dep. at 48, FEC Facts Exh. 5).

92.  The LA-GOP has ongoing and continuous contact with the RNC as well as federal candidates in Louisiana.  (Buckels Dep. at 19-21, FEC Facts Exh. 6).  (J. Stip. at 3).

93.  One of the purposes of state party committees like LA-GOP is to assist in the election of candidates for federal office.  (Buckels Dep. at 19-20, FEC Facts Exh. 6).  In constructing a "victory plan," Republican federal candidates have meetings with both the national parties and the state party.  (Josefiak Dep. at 27, FEC Facts Exh. 5).  State and local party organizations assist federal candidates with voter mobilization and grassroots activities.  (D. Green *McConnell* Rebuttal Report at 10-15 [DEV 5-Tab 1],[1] FEC Facts Exh. 41; Krasno and Sorauf *McConnell* Report at 44-50 [DEV l-Tab 2], FEC Facts Exh. 39; Expert Report of Thomas E. Mann from *McConnell* (Mann *McConnell* Report) at 30 [DEV I-Tab 1], FEC Facts Exh. 53).  (J. Stip. at 3-4).

94.  During an election cycle, LA-GOP also has "constant contact" with the party's federal candidates.  (LA-GOP 30(b)(6) Dep. at 19-20, FEC Exh. 6).  Republican federal officeholders from Louisiana, by virtue of their office, automatically hold the position of an "exofficio, non-voting Member" of the State Central Committee of LA-GOP during their time in office. LA-GOP Bylaws, Art III § 2, FEC Exh. 16. Congressman Cao serves as a member of the State Central Committee for the LA-GOP and the Parish Executive Committee for the Republican party.  (Cao Dep. at 10, FEC Exh. 4)

95.  When federal candidates and officeholders have asked about donors to LA-GOP, the party has "shared that donor list."  (LA-GOP 30(b)(6) Dep. at 25-26, FEC Exh. 6).  The sharing of information also happens in the other direction – LA-GOP receives information from federal candidates about who has contributed to their campaigns.  (*Id.* at 26).

96.  LA-GOP encourages federal candidates to tell their donors to also contribute to LA-GOP. (LA-GOP 30(b)(6) Dep. at 148, FEC Exh. 6).  Donors who have contributed the maximum allowable contribution to an individual candidate are encouraged to contribute more to LA-GOP. (*Id.* at 147; *see also* Meehan Decl. at ¶ 10, FEC Exh. 2).  Then-candidate Cao's 2008 campaign was expected not only to raise money for his campaign, but also to raise money for LA-GOP. (Cao Dep. at 16, FEC Exh. 4 ("we had to raise some money for the state party.")). Volunteers for the Cao campaign solicited contributions to LA-GOP.  (*Id.* at 16-17).

97.  Even after the passage of the soft money restrictions in BCRA, large donors to political

parties are able to receive access to federal officeholders unavailable to the public.  To facilitate

its donors' access to federal candidates and officeholders, the RNC organizes "fulfillment"

events to which individuals who have made a large contribution to the RNC of a specified

amount are invited, and which officeholders such as the President, Vice-President or other

prominent Republicans also attend.  (RNC 30(b)(6) Dep. at 27-30, FEC Exh. 5; Id. at 39-40

("they will have, you know, basically fulfillment requirements where they will be at some resort,

they play a little golf, hear speakers on various issues, and so that will be an ongoing process.")).


98.  These opportunities are only offered to individuals who are "fully contributing" the amount

to the RNC that is required to attend the event.  (RNC 30(b)(6) Dep. at 44-45, FEC Exh. 5).  The

RNC has created tiers of donors with specified benefits based on levels of annual giving: For

example, donors who give $15,000 receive "intimate luncheons, dinners, and meetings with key

policymakers"; donors who give $30,400 "enjoy exclusive private functions with elected

Republican leaders"; and donors who commit to raising $60,800 receive "at least one . . .

exclusive event during the year," as well as other "intimate events with key GOP policymakers."

(Republican National Committee Major Donor Groups 2009, FEC Exh. 25).


99.  For example, at one Republican party event on November 1, 2007, the President of the

United States, six U.S. Senators, and one U.S. Representative attended a dinner with just forty-

nine donors.  (New Republican Regents Dinner Invitation (Nov. 1, 2007), FEC Exh. 26).  The

RNC has organized even smaller Presidential appearances in private homes – events at which the

President has been joined by as few as thirty-nine donors.  (RNC Luncheon Invitation (Sept. 26,

2007), FEC Exh. 27) (thirty-nine attendees)**;** (RNC Presidential Trust Dinner Invitation (March 18, 2008), FEC Exh. 28) (forty-one attendees)**;** (RNC Presidential Trust Luncheon Invitation (March 18, 2008), FEC Exh. 29) (fifty-two attendees). And the RNC has arranged similar interactions with executive branch officials: Senior White House official Karl Rove had breakfast with twenty-eight donors (RNC Breakfast with Karl Rove Invitation (Oct. 10, 2006), FEC Exh. 30**)** and White House Chief of Staff Joshua Bolten had lunch with thirty-seven donors (RNC Luncheon with Josh Bolten Invitation (Oct. 19, 2006), FEC Exh. 31). According to the RNC, however, the actual interaction between donors and candidates or office holders at these events is minimal. "It's basically cookie cutter. Individuals go and socialize. The president, for example, would come, make a speech on a topic for 45 minutes, photo op and leave. . . . It's not like they sit around and have one-on-one like we're having here today." (Josefiak Dep. 45:19-46:3).

100. In *McConnell*, the Supreme Court expressed concerns about the appearance of corruption. Through lobbyists and others, "national parties have actively exploited the belief that contributions purchase influence or protection to pressure donors into making contributions." *McConnell*, 540 U.S. at 148 n.47. As the CEO of a major corporate donor explained, if a corporation had given a lot of money to one party, "the other side," i.e., the opposing national party committee, might have "a friendly lobbyist call and indicate that someone with interests before a certain committee has had their contributions to the other side noticed." (*Id.* (internal quotation marks omitted)).

*Federal Candidates and Officeholders Know the Identity of Their Parties' Large Donors*

101.  Despite the soft money restrictions in BCRA, individual donors can still contribute up to

$30,400 to a national party committee each year and multicandidate PACs can still contribute up

to $15,000 to a national party committee each year.  2 U.S.C. §§ 441a(a)(1)- (2); Price Index

Increases for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure

Threshold, 74 Fed. Reg. 7435, 7436-37 (Feb. 17, 2009).


102.  Federal candidates and officeholders can learn the identity of individuals who have made

large donations to their party.  (Meehan Decl. at ¶ 8, FEC Exh. 2) (" Office holders and

candidates know who the major donors to their parties are.").


103.  One method by which parties and candidates learn the identity of one another's

contributors is through the use of joint fundraising committees.  (Krasno Rept. at 5, FEC Exh. 1).

These committees hold joint fundraising events where donors contribute both to candidates and

parties. (*Id.*).  Such joint fundraising events are a "trend" that has "becom[e] more and more

prevalent." (RNC 30(b)(6) Dep. at 52, FEC Exh. 5).


104.  It is not only "contributions made at the express behest of" a candidate that raise corruption

concerns, *McConnell*, 540 U.S. at 152, but also other contributions, because "[e]lected officials

know exactly who the big party contributors are."  (Declaration of Senator Warren Rudman in

*McConnell* ¶ 12 [DEV 8-Tab 34], FEC Exh. 46; *accord* Declaration of Alan K. Simpson in

*McConnell* (Simpson *McConnell* Decl.) ¶ 5 [DEV 9-Tab 38], FEC Exh. 47; Declaration of

Gerald Greenwald in *McConnell* ¶ 11 [DEV 6-Tab 16], FEC Exh. 48).

105. Federal officeholders are "well aware of the identities of the donors: National party committees would distribute lists of potential or actual donors, or donors themselves would report their generosity to officeholders." *McConnell*, 540 U.S. at 147. "'[F]or a member not to know the identities of these donors, he or she must actively avoid such knowledge as it is provided by the national political parties and the donors themselves.'" *Id.* (quoting *McConnell*, 251 F. Supp. 2d at 487-88) (Kollar-Kotelly, J.) (emphasis added); *see also id.* (citing *McConnell*, 251 F. Supp. 2d at 853-55) (Leon, J.)).

*State and Local Political Parties Are Particularly Well Suited to Facilitate Their Largest Donors' Access to Federal Candidates and Officeholders*

106. State and local parties are "entities uniquely positioned to serve as conduits for corruption" because of their close connection to the national parties and to federal officeholders and candidates. *McConnell*, 540 U.S. at 156 n.51; *see also id.* at 161. Federal candidates and officeholders raise funds for national and state parties. Congressman Meehan "helped the DCCC, the DNC and the Massachusetts Democratic Party raise more than $300,000 in the two elections cycles prior to [his] resignation from office." (Meehan Decl. at ¶ 12, FEC Exh. 2). In fundraising for the Massachusetts Democratic Party, Congressman Meehan "signed onto invitations to political fundraisers" and "made fundraising phone calls to active Democrats to ask them to participate in a given event or coordinated campaign." (*Id.* at ¶ 13).

107. "Congress recognized that" there were also "close ties between federal candidates and state

party committees," and concluded – "based on the evidence before it" – that "state committees function as an alternative avenue for precisely the same corrupting forces" as the national party committees. *McConnell*, 540 U.S. at 161, 164.

108. The very structure of the state and national parties assures that each will be closely linked to the other. For example, the 168 members of the RNC include the chairperson of each state and territorial Republican party, as well as a "National Committeeman" and a "National Committeewoman" from each state and territorial party. (RNC 30(b)(6) Dep. at 12, FEC Exh. 5; LA-GOP 30(b)(6) Dep. at 15, FEC Exh. 6; *Bylaws of the State Central Committee of the Republican Party of Louisiana* (June 7, 2008) (LA-GOP Bylaws), Art. V § 5, FEC Exh. 16 ("The National Committeeman and National Committeewoman shall serve as the representatives of the Party to the Republican National Committee, shall prepare a joint written report annually summarizing the activities of the Republican National Committee, shall submit said report to the State Central Committee at the first quarterly meeting each year and shall perform such other duties as are assigned by the State Central Committee or by the Executive Committee.")). The Bylaws Committee of LA-GOP considers and reports to the State Central Committee regarding such federal issues as "proposed reapportionment plans" "the endorsement of candidates," "the selection of delegates to the Republican National Convention" and "the conduct of Presidential caucuses or primaries." (LA-GOP Bylaws, Art VII § 1, FEC Exh. 16).

**F. The Supreme Court has Recognized that Coordinated Expenditures Present a Risk of Corruption or the Circumvention of Contribution Limits**

109. "Coordinated expenditures of money donated to a party are tailor-made to undermine

contribution limits." *Colorado II*, 533 U.S. at 464.  (FEC Fact 117).

110.   The RNC encourages its candidates to tell their "maxed out" donors to contribute to the RNC.  (RNC 30(b)(6) Dep. at 56-57, FEC Exh. 5).  Congressman Cao has personally suggested to donors who had given the maximum amount to his campaign that they could also contribute to the party.  (Cao Dep. at 17, FEC Exh. 4).

111.   "Donors give to the party with the tacit understanding that the favored candidate will benefit." *Colorado II*, 533 U.S. at 458 (citing Hickmott *Colorado II* Decl., FEC Exh. 34 ("We ... told contributors who had made the maximum allowable contribution to the Wirth campaign but who wanted to do more that they could raise money for the DSCC so that we could get our maximum [Party Expenditure Provision] allocation from the DSCC").

112.   "[I]f a candidate could be assured that donations through a party could result in funds passed through to him for spending on virtually identical items as his own campaign funds, a candidate enjoying the patronage of affluent contributors would have a strong incentive not merely to direct donors to his party, but to promote circumvention as a step toward reducing the number of donors requiring time-consuming cultivation." *Colorado II*, 533 U.S. at 460.

113.   "If a candidate could arrange for a party committee to foot his bills, to be paid with $20,000 contributions to the party by his supporters, the number of donors necessary to raise $1,000,000 could be reduced from 500 (at $2,000 per cycle) to 46 (at $2,000 to the candidate and

$20,000 to the party, without regard to donations outside the election year)." *Colorado II*, 433

U.S. at 460 (footnote omitted) (discussing candidate incentives using the contribution limits

applicable at the time of that case).


114. "The same enhanced value of coordinated spending that could be expected to promote

greater circumvention of contribution limits for the benefit of the candidate-fundraiser would

probably enhance the power of the fundraiser to use circumvention as a tactic to increase

personal power and a claim to party leadership." *Colorado II*, 533 U.S. at 460 n. 23. "If the

effectiveness of party spending could be enhanced by limitless coordination, the ties of straitened

candidates to prosperous ones and, vicariously, to large donors would be reinforced as well.

Party officials who control distribution of coordinated expenditures would obviously form an

additional link in this chain." *Id*. ("[The DSCC's three-member Executive Committee] basically

made the decisions as to how to distribute the money. . . . Taking away the limits on coordinated

expenditures would result in a fundamental transferal of power to certain individual Senators")

(citing Billings *Colorado II* Decl. ¶¶ 3, 19, FEC Exh. 36).


115. "Despite years of enforcement of the challenged limits, substantial evidence demonstrates

how candidates, donors, and parties test the limits of the current law, and it shows beyond

serious doubt how contribution limits would be eroded if inducement to circumvent them were

enhanced by declaring parties' coordinated spending wide open." *Colorado II*, 533 U.S. at 457

(footnote omitted).

**G. Political Parties' Primary Interest is Winning Elections**

116.  A primary goal of all the major political parties is to win elections.  "The ultimate goal of a political party is to get as many party members as possible into elective office, and in doing so to increase voting and party activity by average party members."  (Meehan Decl. at ¶ 5, FEC Exh. 2).  "In practice, electing … candidates is the RNC's primary focus."  *McConnell*, 251 F. Supp. 2d at 470 (Kollar-Kotelly, J.).


117.  Senator McCain testified**,** in connection with the *McConnell* litigation,  that "[t]he entire function and history of political parties in our system is to get their candidates elected, and that is particularly true after the primary campaign has ended and the party's candidate has been selected." (McCain *McConnell* Decl. ¶ 23 [DEV 8-Tab 29], FEC Exh. 51).  Then-RNC Chairman Haley Barbour stated: "The purpose of a political party is to elect its candidates to public office, and our first goal is to elect Bob Dole president . . . .  Electing Dole is our highest priority, but it is not our only priority.  Our goal is to increase our majorities in both houses of Congress and among governors and state legislatures.").  (Chairman's Update to the Members of the Republican National Committee (Aug. 7, 1996) ODP0021-02003 [DEV 70-Tab 48], FEC Exh. 54).  Senator Bumpers testified that he was "not aware that the party has any interest in the outcome of public policy debates that is separate from its interest in supporting and electing its candidates."  (Bumpers *McConnell* Decl. ¶ 6 [DEV 6-Tab 10], FEC Exh. 50).


118.  State parties also have the primary purpose of winning elections.  The "basic role" of the LA-GOP is "to elect Republican candidates to office."  (LA-GOP 30(b)(6) Dep. at 18-19, FEC

Exh. 6). LA-GOP is in constant contact with the federal candidates in Louisiana during an election cycle for the purpose of "[g]etting them elected." (*Id.* at 20; *Id* at 70 ("[C]ertainly we're concerned about issues, but our main emphasis is to run communication in support of electing our candidates.")).

119. The RNC has not been engaged in any sorts of activities that do not reference federal candidates "in a long time." (RNC 30(b)(6) Dep. at 143-45, FEC Exh. 5).

## H. Plaintiffs' Factual and Legal Claims

*Unambiguously Campaign Related Argument*

120. Plaintiffs have challenged, *inter alia*, the application of coordinated expenditure limits to party activities that plaintiffs assert are not "unambiguously campaign related." AVC ¶¶ 52-60, 76-81. (J. Stip. at 9). Plaintiffs explain what they mean by "unambiguously campaign related" both by listing the few activities that purportedly fall within this category, and by listing many other activities that plaintiffs believe do not fall within the category. (*Id.* at ¶¶ 40, 59, 80).

121. Plaintiffs state that the only activities that political parties engage in that are "unambiguously campaign related" are "(a) communications containing express advocacy (explicit words expressly advocating the election or defeat of a clearly identified federal candidate); (b) targeted federal election activity (voter registration, voter identification, get-out the vote, and generic campaign activities that are targeted to help elect the federal candidate involved); (c) paying a candidate's bills; and (d) distributing a candidate's campaign literature."

Plaintiffs claim that no activities by political parties other than the four activities described above are "unambiguously campaign related" and therefore no others can be regulated or restricted under the Constitution. (Complaint ¶¶ 59, 80 (Rec. Doc. 35)).

122.  Plaintiffs state that coordinated "non-targeted voter registration; non-targeted voter identification; non-targeted get-out-the-vote activity and non-targeted generic campaign activity" are not "unambiguously campaign related" and therefore cannot be regulated or restricted. AVC ¶¶ 40, 59, 80.  (J. Stip. at 10).

123.  Plaintiffs currently claim that virtually all voter registration, voter identification, get-out-the-vote activity and generic campaign activity is "non-targeted." (RNC 30(b)(6) Dep. at 150-53, FEC Exh. 5).

124.  "[P]arties do not generally engage in … GOTV activity, voter identification, or voter registration, for any purpose other than to assist in their efforts to elect party members to public office." (Meehan Decl. at ¶ 7, FEC Exh. 2).  Voter registration, voter identification, getout- the-vote (GOTV) activity, and generic campaign activity as defined by BCRA "clearly capture activity that benefits federal candidates," and "funding of such activities creates a significant risk of actual and apparent corruption."  *McConnell*, 540 U.S. at 167-68.  *See McConnell*, 251 F.2d at 460 ("Common sense dictates, and it was 'undisputed' below, that a party's efforts to register voters sympathetic to that party directly assist the party's candidates for federal office")  (Kollar-Kotelly, J.).  *See id.*, at 459 ("'[The evidence] shows quite clearly that a campaign that mobilizes

residents of a highly Republican precinct will produce a harvest of votes for Republican candidates for both state and federal offices. A campaign need not mention federal candidates to have a direct effect on voting for such a candidate . . . . [G]eneric campaign activity has a direct effect on federal elections'" (quoting Green Expert Report 14)). *Id.* (footnote omitted); RNC Memorandum, *Non-Allocable Party Building Programs*, RNC 0084450-64 at 0084455 [DEV 101], FEC Exh. 56 ("There are certain election related party expenditures that make no reference to any specific candidates but do benefit the entire Republican ticket . . . . These generic programs include voter registration[] and GOTV programs . . . . These programs and projects benefit the Republican Party and all of its candidates, federal and state."); Excerpt of Deposition of Alan Philp from *McConnell* at 49, FEC Exh. 57 (Chairman of Colorado Republican Party testifying that state party's "Get-out-the-vote program is designed to benefit all candidates. That could include voter registration and so on and so forth. Q. And is the same true of generic party advertising, in other words, Vote Republican, that's designed to benefit all the candidates? A. Yes.").

125. In 2008, then-RNC Chairman Duncan stated publicly that the RNC's "prodigious fundraising" has allowed it to "buil[d] up over a long period of time" a GOTV program and other "organizational efforts [that] make the difference . . . generally, there's probably a 2 to 5 percent difference in additional turnout for a candidate that you make." (*Victory Dream Team*, CONGRESS DAILY, July 29, 2008, 2008 WLNR 14131041, FEC Exh. 18). This "difference" applies to federal, state, and local candidates. (*Id.*)

126.  The RNC acknowledges it would like to coordinate with candidates the "nontargeted" activities within the scope of its claims at least in part "in an effort to help candidates win elections . . . ."  (RNC 30(b)(6) Dep. at 153-54, FEC Exh. 5).

127.  If voter registration, voter identification, get-out-the-vote activity or generic campaign activity takes place in more than one congressional district, plaintiffs consider it "nontargeted." (RNC 30(b)(6) Dep. at 151, FEC Exh. 5 ("[if] you were having a voter registration drive in multiple districts outside of any election, then I don't think that's [] targeted.")).

128.  If voter registration, voter identification, get-out-the-vote activity or generic campaign activity takes place in only part of a congressional district, Plaintiffs consider it "nontargeted." (RNC 30(b)(6) Dep. at 151, FEC Exh. 5 ("If you had a voter registration drive in just one county, I would say that was a non-targeted voter registration drive, because you're not affecting the entire district of that candidate."); *Id.* at 152 ("Q. So it's only targeted if it's exactly every district, every part of a district and not anything more, does that make sense? A. Right.")).

129.  If voter registration is done in a district in a manner that references multiple candidates, plaintiffs consider it "non-targeted." (RNC 30(b)(6) Dep. at 153, FEC Exh. 5 ("in the example of the two, two or more candidates being mentioned, the answer is yes, that would not be targeted").

130.  What plaintiffs consider "targeted" voter registration rarely happens "because voter registration is usually done statewide, or even if it's done within a district, there are multiple

candidates on a ballot within the district."  (RNC 30(b)(6) Dep. at 150, FEC Exh. 5).

131.  Voter identification, registration, or GOTV efforts that are conducted in a geographic area greater than or smaller than a single congressional district still benefit the campaign of a candidate running in a district in which the activity is undertaken.  (Meehan Decl. at ¶ 25-26, FEC Exh. 2).

132.  Plaintiffs also state that "issue advocacy, including ads that mention candidates" is not an "unambiguously campaign related" activity and therefore cannot be regulated or restricted, even within the 90-day or 120-day periods before an election.  (AVC ¶¶ 40, 59, 80). According to plaintiffs, such ads can never constitutionally be regulated unless they contain "explicit words expressly advocating the election or defeat of a clearly identified federal candidate." (*Id.* at ¶¶ 59, 80).

133.  Plaintiffs state that "public communications of any kind involving support or opposition to state candidates, support or opposition to political parties, or support or opposition to candidates generally of a political party" are not "unambiguously campaign related" and therefore cannot be regulated or restricted. (AVC ¶¶ 40, 59, 80).  However, public communications that do not clearly identify any specific federal candidate are not considered party coordinated communications under Commission regulations.  11 C.F.R. § 109.37(a).

134.  Plaintiffs' claim, if successful, would enable parties to run unlimited amounts of "issue

ads" designed to influence federal elections, in coordination with candidates. Among the "issue ads" that plaintiffs have indicated they would have liked to have coordinated with then-candidate Cao and run just before the 2008 general election in Louisiana was one addressing former Congressman William Jefferson's "pending trial and alleged corruption." (AVC ¶ 48).

135. Plaintiffs' claim, if successful, would enable parties to run unlimited amounts of "grassroots lobbying" ads designed to influence federal elections, in coordination with candidates. LA-GOP acknowledges that the reason it would like to coordinate its grassroots lobbying with candidates is that "it brings the candidate into the message and gives us a greater chance of electing a candidate." (LA-GOP 30(b)(6) Dep. at 72, FEC Exh. 6).

136. Congressman Cao testified that if the RNC could have engaged in more coordinated expenditures with his campaign, his preference would be that "the bulk of the money would go into – into TV, mailings, radio advertising." (Cao Dep. at 14-15, FEC Exh. 4). "When a party can run coordinated expenditures to ensure the candidate's name and image are on television during [the last week or so before a general election], this benefits the candidate's campaign and may even make the difference between election or defeat." (Meehan Decl. at ¶ 24, FEC Exh. 2).

137. None of the coordinated communications within the apparent scope of plaintiffs' claims are currently restricted by the limits on party coordinated communications until 90 days before a Congressional or Senate election, or 120 days before a Presidential election. A party communication prior to these 90-day or 120-day windows before an election is not deemed

coordinated with a candidate unless it "disseminates, distributes, or republishes . . . campaign materials prepared by a candidate," or "expressly advocates the election or defeat of a clearly identified candidate."  11 C.F.R. §§ 109.21(c)(2)-(3); 109.37.

*"Own Speech" Arguments*

138.  Plaintiffs have challenged the constitutionality of limits on party coordinated communications that represent a party's "own speech."  (AVC ¶¶ 61-64,82-85).  (J. Stip. at 10).

139.  Plaintiffs currently allege that any time a political party pays for a communication and discloses publicly that it has done so, it is the party's "own speech" and therefore limits on such speech are unconstitutional.  (Cao Dep. at 52, FEC Exh. 4 (stating that if a particular communication is paid for by the party, it is the party's "own speech."); LA-GOP 30(b)(6) Dep. at 124, FEC Exh. 6 (LA-GOP's "own speech" is "any communication that the LAGOP states through one form or another, that we have issued it, it is paid for by us … ."); *id.* at 133 (it is the party's own speech "if we have taken responsibility, quote, ownership, of it by stating that we have paid for it … ."); RNC 30(b)(6) Dep. at 124, FEC Exh. 5 (communication becomes a party's "own speech" if the party "[a]pprove[s] it and pay[s] for it."); RNC's 2nd Discovery Resps., Interrog. 1, FEC Exh. 10 (communication is a party's "own speech" whenever it is indicated as such by "a disclaimer, where one is required, or by the speech being otherwise identified as the party's speech."); LA-GOP's 2nd Discovery Resps., Interrog. 1, FEC Exh. 11 (same)).

140.  Plaintiffs claim that a party coordinated communication disclosed as having been paid for by the party is the party's "own speech" even if a candidate or her campaign is materially involved in determining when the communication will be broadcast.  (AVC ¶¶ 46-47; LA-GOP 30(b)(6) Dep. at 126, FEC Exh. 6).

141.  Plaintiffs claim that a party coordinated communication disclosed as having been paid for by the party is the party's "own speech" even if a candidate or her campaign edits the content of the communication.  (LA-GOP 30(b)(6) Dep. at 126-27, FEC Exh. 6; RNC 30(b)(6) Dep. at 167, FEC Exh. 5 ("the fact that the RNC decided to run it with those edits, it would be the RNC's speech.")).

142.  Plaintiffs claim that a party coordinated communication disclosed as having been paid for by the party is the party's "own speech" even if a candidate or her campaign decides which out of a group of proposed party communications should be broadcast.  (LA-GOP 30(b)(6) Dep. at 128, FEC Exh. 6; RNC 30(b)(6) Dep. at 166-67, FEC Exh. 5).

143.  Plaintiffs claim that a party coordinated communication disclosed as having been paid for by the party is the party's "own speech" even if the candidate or her campaign actually creates the communication and passes it along to the party.  (LA-GOP 30(b)(6) Dep. at 127-28, FEC Exh. 6; RNC 30(b)(6) Dep. at 85-86, FEC Exh. 5 ("initially it would have been the campaign speech, but, then if the RNC approached to ask if they would buy the time, I think then it becomes the RNC's speech."); *id.* at 123-24 ("I don't believe, from a speech perspective, who

prepares the actual script matters. It's whether or not the entity would accept that as its speech and pay for it.")).

144. Plaintiffs claim that a party coordinated communication disclosed as paid for by the party is the party's "own speech" even if a candidate indicates in the communication that he has approved the message. (LA-GOP 30(b)(6) Dep. at 128-29, FEC Exh. 6; RNC 30(b)(6) Dep. at 86, 107-108, FEC Exh. 5).

145. The only type of party-coordinated communication that plaintiffs believe is not a party's "own speech" and therefore may be constitutionally limited is one that a campaign airs and for which the party merely pays the bill. (LA-GOP 30(b)(6) Dep. at 129-30, FEC Exh. 6 ("If we are merely paying the bill, that is not our speech."); *id* at 145-46 ("Q. Can you think of any other example of a situation [other than paying a candidate's bill] where LAGOP would spend money on a public communication but it would not be LAGOP's own speech? A. No."); RNC's 2nd Discovery Resps., Interrog. 1, FEC Exh. 10 ("merely paying a candidate's bills is always subject to coordinated expenditure limits."); LA-GOP's 2nd Discovery Resps., Interrog. 1, FEC Exh. 11 (same)).

146. When Plaintiffs described the concept of "own speech" in the Complaint, they did not allege that party coordinated communications were the party's "own speech" so long as they were disclosed to have been paid for by the party. (AVC ¶¶ 62-63, 83). Rather, Plaintiffs stated that a communication is a party's "own speech" if it is "'not functionally identical to

contributions' because it is 'not a mere general expression of support for the candidate and his views, but a communication of the underlying basis for the support,' not just 'symbolic expression, . . . but a clear manifestation of the party's most fundamental political views.'" (*Id.* at ¶¶ 62, 83 (quoting *Colorado II*, 533 U.S. at 468 & 468 n.2 (Thomas, J., dissenting) (internal quotations omitted)). Similarly, Plaintiffs stated in their first written discovery responses that a communication is a party's "own speech" if the communication contains the party's "underlying basis for support" because such speech would be "more than symbolic expression of support, even if coordinated." (RNC's Discovery Resps., Interrog. 5, FEC Exh. 7; LA-GOP's Discovery Resps., Interrog. 5, FEC Exh. 8).

147. Plaintiffs' Complaint identifies only a single example of what plaintiffs believe would constitute a communication that falls within the "own speech" category – an advertisement allegedly written without Congressman Cao's involvement, but for which the party would consult with the Congressman as to "the best timing" to run the ad. (AVC ¶¶ 43-44, 46-47).

*Factual Claims*

148. RNC and LA-GOP each spent their $42,100 expenditure limits under the Party Expenditure Provision in connection with the campaign of Joseph Cao, and RNC reached its $5,000 contribution limit. RNC and LA-GOP each wanted to make more expenditures that would be subject to the $5,000 contribution limit and the $42,100 expenditure limit and would have done so if it were legal to do so. (AVC ¶ 39). (J. Stip. at 8).

149.  In addition, a specific express-advocacy communication that RNC intended to make, if legally permitted by the judicial relief sought in this case, is a radio ad (*RNC Cao Ad*) with the following script:

> Why We Support Cao
>
> The Republican National Committee has long stood for certain core principles, which we believe are the fundamentals of good government. When it comes to the issues of lower taxes, individual freedoms and a strong national defense, we need leaders who will stand with the American people and defend those issues.
>
> We need leaders who understand that our economy is in a recession, our individual freedoms are constantly under attack and we continue to fight the global war on terrorism to keep our families safe.
>
> Joseph Cao understands and fights for those issues. And, that is why we ask you to join us in supporting him on December 6. It's important for Louisiana and important for the country.

(AVC ¶ 43).  (J. Stip. at 8).

150.  RNC intended to coordinate the *RNC Cao Ad* with Joseph Cao as to the best timing for the *Ad*, but otherwise the *Ad* would not have been coordinated with Cao.  (AVC ¶ 44).  (J. Stip. at 8).

151.  The LA-GOP intended to air an identical ad, and similarly wanted to coordinate with Cao only as to the timing of the ad.  (J. Stip. at 8-9).

152.  Some other specific activities that RNC intended to do and to coordinate with Joseph Cao, if legally permitted to do so without contribution or expenditure limits by the judicial relief sought in this case, were the following:

> Issue advocacy concerning U.S. Representative William Jefferson, including his:
>     Position on the pending auto industry bailout;

> Position on serious ethics reform in Congress;
> Opposition to off-shore oil-drilling;
> Failure to support tax assistance for hurricane victims on the Gulf Coast;
> Support for taxpayer funding for Planned Parenthood;
> Support for increases in the federal income tax, the marriage tax penalty, the child tax
> credit, investment tax, and the death tax.

(AVC ¶ 45).

153.  Some other specific activities that LA-GOP intends to do and to coordinate with Joseph Cao, if legally permitted to do so without contribution or expenditure limits by the judicial relief sought in this case, are the following:

> issue-advocacy concerning U.S. Representative William Jefferson, including his: (a) pending trial and alleged corruption; (b) his repeated votes against off-shore oil-drilling; (c) vote to earmarks funds for a personal library and private office for Rep. Charles B. Rangel (Charlie Rangel has made campaign contributions to Jefferson); (d) vote against the financial bailout plan that included tax assistance for hurricane victims on the Gulf Coast; (e) vote to allow taxpayer funding for Planned Parenthood; (f) repeated votes to block consideration of the 2001 and 2003 cuts on income tax, the tax marriage penalty, the child tax credit, investment tax, and the death tax.

> issue advocacy and lobbying (direct and grassroots) on pending legislative matters, such as the auto industry bailout to be considered when Congress reconvenes December 2nd, encouraging Louisiana Second Congressional District voters to contact Representative Jefferson and insure that any measure has taxpayer protections and demands a 21st century business model that includes renegotiated labor contracts.

(AVC ¶ 48, Buckels Dep. 91:2-8, 96:19-98:9, 99:22-100:16, 100:21-102:10).

154.  RNC and LA-GOP want to make similar express-advocacy communications in the future, and there is a strong likelihood that the circumstances leading to this lawsuit will be repeated, given the recurring nature of elections, the ongoing existence and intended activities of RNC and LA-GOP, and the regular recurrence of a broad range of issues in public and congressional

debate.  (AVC ¶ 50).  (J. Stip. at 9).

155.  During the 2008 cycle, then-candidate Cao's congressional campaign had receipts of $242,531, including $5,000 in contributions from the RNC and $500 from the South Carolina Republican Party, and also had the benefit of $83,971 in coordinated expenditures from the RNC (using its own and the LA-GOP's Section 441a(d) authority).  (Biersack Decl. ¶ 16, Table 23, FEC Exh. 3).  As of June 30, 2009, Mr. Cao reported receiving more funds for the upcoming 2010 election cycle than he received during the entire 2008 election cycle.  In the current cycle, he has reported $516,957 in total receipts, including $4,560 from LA-GOP, and he has also had the benefit of $2,822 in coordinated expenditures.  (*Id.*)  As of June 30, 2009, Mr. Cao had already disbursed $185,668 in funds for the 2010 election.  (*Id.*)

156.  As a candidate, Cao found some of the independent expenditures conducted by Republican party groups to be counterproductive and harmful.  His constituents held him accountable for the content, even though he was not consulted about the content and it was contrary to the goals of his campaign.  (Cao Dep. at 34- 35, 42-43, FEC Exh. 4).  (J. Stip. at 9).

## IV.  Certification of Constitutional Questions

As set forth in Part II, the Cao plaintiffs ask the Court to certify eight questions.  The questions will be addressed in turn, though the second and fifth questions and the third and sixth questions were addressed jointly by the parties and will be addressed jointly by the Court.

This is not the first time opponents of campaign finance regulation have brought an as

applied challenge to the Constitutionality of a narrow provision of the Act. *See*, *e.g.*, *Citizens United, Citizens United v. Federal Election Comm'n*, _ S. Ct._, 2010 Westlaw 183856 (Jan. 21, 2010); *FEC v. Wisconsin Right to Life*, 551 U.S. 449 (2007) (*WRTL II*); *Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n*, 518 U.S. 604 (1996) (*Colorado I*). To say these challenges were narrow is not to say they were insubstantial. In *WRTL II*, the Supreme Court held that the so-called "issue ads" that were the subject of that litigation were neither "express advocacy nor its functional equivalent" and therefore could not be constitutionally regulated. This holding affected its previous ruling in only a small part of *McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003), but by clarifying the definition of "electioneering communication" it had a profound impact on the acceptable use of "issue ads." The Court here must therefore determine if the Supreme Court's previous rulings have foreclosed the challenges before it, or if such a window remains open.

**Overview**

"The constitutional power of Congress to regulate federal elections is well-established." *Buckley v. Valeo*, 424 U.S. 1, 13. It has done so through enacting an intricate statutory scheme that restricts campaign contributions and expenditures across a broad spectrum of individuals and entities involved in federal political campaigns. *Buckley,* 424 U.S. at 12. Nevertheless, in *Buckley,* the Supreme Court concluded that limitations on campaign expenditures, on independent expenditures by individuals and groups, and on expenditures by a candidate from his personal funds were violations of freedom of speech and unconstitutional. 424 U.S. 1, 143-44 (1976). However, campaign contributions, which indicate support for a candidate but not the underlying reason for the support can be regulated because such regulations only marginally

impact speech.  *Id.* at 26.  The Supreme Court further held that coordinated campaign

expenditures – that is, expenditures that are provided by a donor which is controlled by or

coordinated with a candidate and the campaign – are properly considered functionally equivalent

to contributions, and are therefore also regulable.  *Id.* at 47.

At issue in this case are the contribution and expenditure regulations imposed by law

upon political parties in conjunction with federal election campaigns.  More specifically, the

plaintiffs Anh Cao, RNC, and LA-GOP challenge the following provisions of the statute: 2

U.S.C. § 441a(d)(2-3); 2 U.S.C. § 441a(a)(2)(A); and 2 U.S.C. § 441a(a)(7)(B)(i).

## A.  *Question 1 – Standing*

Question One of the plaintiffs' Motion to Certify asks if each of the plaintiffs alleged

sufficient injury to constitutional rights enumerated in the questions to create a constitutional

"case or controversy" within the judicial power of Article III.

The FEC does not appear to oppose certification of this question, (*See* Rec. Docs. 28, 74)

and instead argues that the LA-GOP does not have statutory standing to bring a Motion to

Certify under the § 437h of the Act.  A plain reading of the Act shows that they are correct: "the

national committee of any political party, or any individual eligible to vote in any election for the

office of President may institute such actions in the appropriate district court of the United

States."  The LA-GOP falls into neither of these groups.  The Court therefore certifies Question

1 as non-frivolous, but holds that the LA-GOP does not have standing to appear before the Fifth

Circuit panel on the Motion to Certify.

*B. Questions 2 and 5–"Unambiguously Campaign Related"*

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court concluded that limitations on campaign expenditures, on independent expenditures by individuals and groups, and on expenditures by a candidate from his personal funds are constitutionally infirm as violating freedom of speech. *Id.* at 143-44. However, campaign contributions, which are speech primarily in their symbolic content, can be regulated. *Id.* at 26. The Supreme Court further held that because coordinated campaign expenditures are functionally equivalent to contributions, they too are regulable. *Id.* at 47.

Before *Colorado I*, 518 U.S. 604 (1996), the FEC treated all political party expenditures as coordinated. *Colorado II*, 533 U.S. 431, 438 (2001). But *Colorado I* held that limits on a political party's *independent* expenditures were unconstitutional. 518 U.S. at 614. *Colorado II*, however, held that limits on a party's *coordinated* campaign expenditures, which are considered contributions under 2 U.S.C. § 441a(a)(7)(B)(i), were constitutional. 533 U.S. at 465.

Questions Two and Five of the Cao plaintiffs' Motion to Certify are both premised on the idea that *all* campaign finance regulations are subject to an "unambiguously campaign related" requirement. Cao lists four activities that he concedes are, in fact, unambiguously campaign related: a) express advocacy; b) targeted federal election activity c) disbursements; and d) campaign literature. Question Two specifically alleges that § 441a(d)(2-3),[12] which limits

---

[12] 2 U.S.C. § 441a(d):
Expenditures by national committee, State committee, or subordinate committee of State committee in connection with general election campaign of candidates for Federal office . . .

      **(2)** The national committee of a political party may not make any expenditure in connection with the general election campaign of any candidate for President of

expenditures "in connection" with a candidate's campaign, is vague and overbroad. Question

Five alleges that the $5000 limit on contributions from multicandidate political committees to

any candidate under § 441a(a)(2)(A)[13] and the provision defining coordinated expenditures as

contributions, § 441a(a)(7)(B)(i),[14] are vague, overbroad, and beyond Congress's authority to

---

the United States who is affiliated with such party which exceeds an amount equal to 2 cents multiplied by the voting age population of the United States (as certified under subsection (e) of this section). Any expenditure under this paragraph shall be in addition to any expenditure by a national committee of a political party serving as the principal campaign committee of a candidate for the office of President of the United States.

**(3)** The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds--

**(A)** in the case of a candidate for election to the office of Senator, or of Representative from a State which is entitled to only one Representative, the greater of--

**(i)** 2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or
**(ii)** $20,000; and
**(B)** in the case of a candidate for election to the office of Representative, Delegate, or Resident Commissioner in any other State, $10,000.

[13] 2 U.S.C. § 441a:
(a) Dollar limits on contributions . . .
    **(2)** No multicandidate political committee shall make contributions–
        **(A)** to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000

[14] 2 U.S.C. § 441a:
(a) Dollar limits on contributions . . .
    **(7)** For purposes of this subsection– . . .
        **(B)(i)** expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate

regulate.

In support of their the arguments, the Cao plaintiffs posit a variety of factual circumstances that they allege would not be "unambiguously campaign related." For example, they argue that coordinated "non-targeted voter registration; non-targeted voter identification; non-targeted get-out-the-vote activity and non-targeted generic campaign activity" are not "unambiguously campaign related" and therefore cannot be regulated or restricted. (AVC ¶¶ 40, 59, 80).[15] In addition, the Cao plaintiffs assert that "issue advocacy, including ads that mention candidates" is not an "unambiguously campaign related" activity and therefore cannot be regulated or restricted, even within the 90-day or 120-day periods before an election. (AVC ¶¶ 40, 59, 80). According to plaintiffs, such ads can never be constitutionally regulated unless they contain "explicit words expressly advocating the election or defeat of a clearly identified federal candidate." (*Id.* at ¶¶ 59, 80). The RNC acknowledges it would like to coordinate with candidates the "nontargeted" activities within the scope of its claims at least in part "in an effort to help candidates win elections . . . ." (RNC 30(b)(6) Dep. at 153-54, FEC Exh. 5).

The Cao plaintiffs' primary legal argument is that the courts need to establish a cognizable line between coordinated party spending that is unambiguously campaign related and coordinated party spending that is not. (Rec. Doc. 76 at 15). Currently, the FEC promulgates regulations establishing how to determine whether activities fall within the provisions governing

---

[15] None of the coordinated communications within the apparent scope of plaintiffs' claims are currently restricted by the limits on party coordinated communications until 90 days before a Congressional or Senate election, or 120 days before a Presidential election. A party communication prior to these 90-day or 120-day windows before an election is not deemed coordinated with a candidate unless it "disseminates, distributes, or republishes . . . campaign materials prepared by a candidate," or "expressly advocates the election or defeat of a clearly identified candidate." 11 C.F.R. §§ 109.21(c)(2)-(3); 109.37.

coordination.  11 C.F.R. § 109.37.  Per these guidelines, party communications are coordinated expenditures if they disseminate, distribute, or republish campaign materials prepared by a candidate, if they expressly advocate for a clearly identified candidate, or if they refer to a clearly identified candidate within specified time windows leading up to elections.  The Cao plaintiffs argue that the FEC's acknowledgment that some line exists demonstrates a constitutionally deficient ambiguity in the current statutory language.  (Rec. Doc. 76 at 11).

Further, the Cao plaintiffs argue that the Supreme Court has consistently applied *some* test–though not necessarily the "unambiguously campaign related" test–to determine whether communications fall within Congress's regulatory power.  For example, they cite *Wisconsin Right to Life v. FEC (WRTL II)*, 551 U.S. at 479, for the holding that campaign advertisements can only be regulated if they are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *Id.*  (Rec. Doc. 76 at 15).  *WRTL II* was an as applied challenge to part of the Bipartisan Campaign Reform Act (BCRA) facially upheld in *McConnell*, and held that the line established in *McConnell* was overbroad as applied to the facts of the case.  *Id.*

The Cao plaintiffs also point to several decisions in other circuits, most notably *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008), that they argue demonstrate that the "unambiguously campaign related" language applies to all campaign finance regulation. (Rec. Doc. 76 at 7).[16]  Similarly, they point to a brief filed in *McConnell*, 540 U.S. 93, by

----

[16]  They also cite *New Mexico Youth Organized v Herrera*, No. 08-1156 (D. N.M. Aug. 3, 2009) (mem.and order granting summ. j.); *Broward Coalition of Condominiums, Homeowners Associations and Community Organizations v. Browning*, No. 4:08-cv-445, 2009 WL 1457972 (same); and *National Right to Work Legal Defense and Education Foundation v. Herbert*, 581 F. Supp. 2d 1132, 1149 (D. Utah 2008).

supporters of the BCRA, in which they argued that BCRA was a constitutional "adjustment of the definition of which advertising expenditures are campaign related." (Rec. Doc. 62 at 7) (quoting *Brief for Intervenor-Defendants Senator John McCain et al.* at 57, *McConnell*, 540 U.S. 93 (*available at* http://supreme.lp.findlaw.com/supreme_court/briefs/02-1674/02-1674.mer.int.cong.pdf).

The FEC makes several counter-arguments. Their strongest arguments are interrelated: that 1) the unambiguously campaign related language and its cousins are reserved for expenditures, and have never been applied to contributions, and 2) the expenditure "lines" are the product of statutory interpretation, not constitutional limitation. (Rec. Doc. 65 at 22-26). The Court agrees. Plaintiffs are attempting to conflate the Supreme Court's jurisprudence limiting expenditures, where the content of the communication is inherently at issue and "lines" are inherently necessary, with that limiting contributions, where it is the act of coordination with political candidates that makes the communication regulable.[17]

Since *Buckley*, the Supreme Court has never applied a limiting "line" to coordinated campaign expenditures. The portion of the *Buckley* decision that introduced the phrase "unambiguously campaign related" was explicitly discussing expenditure limits as distinct from contribution limits:

> In Part I we discussed what constituted a 'contribution' for purposes of the contribution limitations set forth in 18 U.S.C. s 608(b). We construed that term to include not only contributions made directly or indirectly to a candidate, political party, or campaign committee, and contributions made to other organizations or individuals but

---

[17] As discussed in Part C, *infra*, the Court holds that the plaintiffs' similar argument regarding "own speech" is non-frivolous, because own speech might be sufficiently independent so as not to be functionally a contribution. *See Colorado II*, 533 U.S. at 463.

earmarked for political purposes, but also all expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate. . . . So defined, "contributions" have a sufficiently close relationship to the goals of the Act, for they are connected with a candidate or his campaign.

When we attempt to define "expenditure" in a similarly narrow way we encounter line-drawing problems. . . . To insure that the reach of s 434(e) is not impermissibly broad, we construe "expenditure" for purposes of that section in the same way we construed the terms of s 608(e) to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate. This reading is directed precisely to that spending that is <u>unambiguously related</u> to the campaign of a particular federal candidate.

*Buckley*, at 78-80 (emphasis added).

Further, the line drawn in *Buckley* was to *avoid* a Constitutional difficulty, specifically as to the expenditure provisions of FECA: "in order to preserve the provision against invalidation on vagueness grounds, [the challenged provision of the FECA] must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Buckley*, at 44. As the Court later explained, the "express advocacy line" was "an endpoint of statutory interpretation, not a first principle of constitutional law." *McConnell v. FEC*, 540 U.S. 93, 191 (2003). The *McConnell* court reiterated, "a plain reading of *Buckley* makes clear that the express advocacy limitation, in both the expenditure and the disclosure contexts, was the product of statutory interpretation rather than a constitutional command. In narrowly reading the FECA provisions in *Buckley* to avoid problems of vagueness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy standard." 540 US at 191-92. The *McConnell* court made the above holding in the context of addressing a challenge to coordinated contributions: "there is no reason why Congress may not treat coordinated disbursements for electioneering communications in the same way it treats all other coordinated

expenditures." *Id.*

The Cao plaintiffs' reliance on *Leake* and the *McConnell* brief is similarly unpersuasive. *Leake* was about *state* campaign finance law, and the language quoted by Cao was not being used to put a fine point on the contours of regulable speech[18]: it was a background explanation of the state of campaign finance law. 525 F.3d at 281. The FEC's characterization of this language as dicta is accurate. Similarly, the brief by members of Congress in *McConnell* was not adopted by the high court and in no way reflects controlling precendent.

To the contrary, the high court has expressly noted the distinction in the level of scrutiny (and tailoring of the law) required for coordinated expenditures as distinct from independent expenditures. Coordinated expenditures pose a sufficient risk of corruption and circumvention to warrant stricter regulation. "[S]ubstantial evidence demonstrates how candidates, donors, and parties test the limits of the current law, and it show beyond a serious doubt how contribution limits would be eroded if inducement to circumvent them were enhanced by declaring parties' coordinated spending wide open." *Colorado II*, 533 U.S. at 457. However, when an expenditure is not coordinated, the concern over corrupting influence is significantly reduced because the candidate is not beholden to the entity making the expenditure. In such cases, an "unambiguously campaign related" requirement is appropriate, because absent the heightened risk of corruption (or the appearance thereof) the government's interest in regulation is greatly diminished: "[Independent] expenditures [are] not potential alter egos for contributions, . . . and therefore . . . qualify[] for the most demanding First Amendment scrutiny employed in *Buckley*. Thus, in *Colorado I*, [the Supreme Court] could not assume, 'absent convincing evidence to the

---

[18] The same can be said of the district court decisions cited by the plaintiffs.

contrary,' that the Party's independent expenditures formed a link in a chain of corruption-by-conduit.'" *Colorado II*, 533 U.S. at 463-64 (quoting *Colorado I*, 518 U.S. 617). The *Colorado II* went on to note that "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." 533 U.S. at 463-64 (quoting *Buckley*, 424 U.S. at 47).

In sum, Supreme Court jurisprudence has repeatedly emphasized that it is the coordination with the candidate, not the relationship between the speech and a campaign, that makes the communication Constitutionally regulable: "There is no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate, and there is good reason to expect that a party's right of unlimited coordinated spending would attract increased contributions to parties to finance exactly that kind of spending. Coordinated expenditures of money donated to a party are tailor-made to undermine contribution limits." *Colorado II*, 533 U.S. at 464 (footnote omitted). Thus, "the constitutionally significant fact" that caused to Court to allow independent expenditures in *Colorado I* (but disallow coordinated expenditures in *Colorado II*) "was the lack of coordination between the candidate and the source of the expenditure." 533 U.S. at 464 (quoting *Colorado I*, 518 U.S. 617).

The Cao plaintiffs have not raised arguments sufficient to convince the Court that 2 U.S.C. §§ 441a(d)(2-3), 441a(a)(2)(A), and 441a(a)(7)(B)(I) are vague, overbroad, or beyond Congress's authority to regulate. The Court finds Questions 2 and 5 of the plaintiffs' Motion to Certify to be frivolous, and DENIES their motion as to these questions. The Court also

GRANTS the FEC's motion for summary judgment as to these questions.

## C. Questions 3 and 6–the "Own Speech" Claims

The Cao plaintiffs' Questions Three[19] and Six[20] argue that *Colorado II* explicitly left room for an as applied challenge for coordinated expenditures that are the party's "own speech." (Rec. Doc. 76 at 26). They argue that such speech, even though coordinated, is not "functionally identical to contributions" and cannot be given the same scrutiny as coordinated expenditures that are controlled by the candidate. This argument derives from Justice Thomas's dissent in *Colorado II,* along with two footnotes in the same case, one in the majority opinion and one from Justice Thomas's dissent. In the dissent, Thomas wrote that a wide category of speech that the Court's ruling encompassed should have been "entitled to the same protection as independent expenditures." 533 U.S. at 467-68. For example, he wrote, "in a situation in which the party develops a television advertising campaign touting a candidate's record on education, and the party simply 'consult[s]' with the candidate on which time slot the advertisement should run for maximum effectiveness. I see no constitutional difference between this expenditure and a purely independent one." *Id*. He reasoned that, based on the language of *Buckley*, such an advertisement would not be a "mere general expression of support for the candidate and his

---

[19] "Do the expenditure limits at 2 U.S.C. § 441a(d)(2)-(3) violate the First Amendment rights of one or more plaintiffs as applied to coordinated expenditures for (a) communications containing express advocacy and (b) targeted federal election activity?" (Rec. Doc. 19 at 3).

[20] "Do the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) and Coordinated Contribution Provision at 2 U.S.C. § 441a(a)(7)(B)(i) (treating coordinated expenditures as "contributions") violate the First Amendment rights of one or more plaintiffs as applied to coordinated expenditures for (a) communications containing express advocacy and (b) targeted federal election activity?" (Rec. Doc. 19 at 4).

views but a communication of the underlying basis for the support." *Id.* at 468. The majority acknowledged this possibility in their footnote 17:

> Whether a different characterization, and hence a different type of scrutiny, could be appropriate in the context of an as-applied challenge focused on application of the limit to specific expenditures is a question that, as Justice THOMAS notes we need not reach in this facial challenge.
>
> The Party appears to argue that even if the Party Expenditure Provision is justified with regard to coordinated expenditures that amount to no more than payment of the candidate's bills, the limitation is facially invalid because of its potential application to expenditures that involve more of the party's own speech. But the Party does not tell us what proportion of the spending falls in one category or the other, or otherwise lay the groundwork for its facial overbreadth claim.

533 U.S. at 456 n.17. Justice Thomas elaborated:

> The Court makes this very assumption [that all coordinated expenditures are functionally equivalent to contributions] ("There is no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate"). To the extent the Court has not defined the universe of coordinated expenditures and leaves open the possibility that there are such expenditures that would not be functionally identical to direct contributions, the constitutionality of the Party Expenditure Provision as applied to such expenditures remains unresolved. At oral argument, the Government appeared to suggest that the Party Expenditure Provision might not reach expenditures that are not functionally identical to contributions. See Tr. of Oral Arg. 15 (stating that the purpose of the Party Expenditure Provision is simply to prevent someone "from making contributions in the form of paying the candidate's bills").

*Id.* at 469 n.2.

Not coincidentally, perhaps, the Cao plaintiffs' as applied challenge presents just the situation contemplated by Justice Thomas: the RNC and LA-GOP have developed an advertisement touting Cao's record and values and tying them to the Republican party's core values, with the following script:

> Why We Support Cao
>
> The Republican National Committee has long stood for certain core principles, which we believe are the fundamentals of good government. When it comes to the issues of lower taxes, individual freedoms and a strong national defense, we need leaders who

will stand with the American people and defend those issues.

    We need leaders who understand that our economy is in a recession, our individual freedoms are constantly under attack and we continue to fight the global war on terrorism to keep our families safe.

    Joseph Cao understands and fights for those issues. And, that is why we ask you to join us in supporting him on December 6. It's important for Louisiana and important for the country.

(J. Stip. at 8).  They wanted to coordinate with Cao only as to the timing of  running the ad.

The Cao plaintiffs also argue that conveying the "underlying basis for support" is not the sole means by which parties could bring their coordinated expenditures out from under the umbrella of "functional" contributions.  They assert that by paying for the speech directly (instead of providing the funds to the candidate to do so), a party is "adopt[ing]" the speech as its own, "regardless [of] who came up with an idea" or whether the candidate was consulted, and therefore it is an expenditure, not a contribution.  (Rec. Doc. 62 at 13-15).  In this as applied challenge, they argue that the ad described above would be attributable to the party, not the candidate, because they "bear a disclaimer showing that they paid for them."  (Rec. Doc. 62 at 14).  In support, they point to language in *Buckley*: "While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor."  424 U.S. at 20-21.

The FEC attempts to parse the majority's language in Footnote 17 of *Colorado II,* arguing that the Court was merely explaining the limits of its decision.  (Rec. Doc. 74 at 12).  The FEC also argues that the Cao plaintiffs' argument was foreclosed by the Supreme Court in *Colorado I*, when it wrote that "the constitutionally significant fact [in determining whether party expenditures have a potential for corruption] . . . is the [presence or] lack of coordination

between the candidate and the source of the expenditure."  518 U.S. 604, 617 (1996); (Rec. Doc.

74 at 14).  They argue that allowing the argued-for exception would allow precisely the type of

circumvention the high court has for so long sought to avoid.  (Rec. Doc. 65 at 21).  Finally, the

FEC argues that the plaintiffs' definition of "own speech" is unworkable.  (Rec. Doc. 74 at 15-

16).  These arguments are ultimately unpersuasive.

As discussed in Part B, *supra*, the Supreme Court has repeatedly affirmed that

coordinated expenditures are comparable to contributions under a First Amendment analysis.

*Buckley*, 424 U.S. at 47; *Colorado II*, 533 U.S. at 457, 463-64.  Thus, party communications that

would otherwise be deemed expenditures, when coordinated, become– "functionally" –

contributions.  *Colorado II*, 533 U.S. at 464.  Indeed, it is the act of coordination that, to use the

plaintiffs' terms, arguably make a communication "unambiguously campaign related" and

regulable.  The same strong justifications for such a policy discussed above also apply here: if

contributions to a party are used for coordinated communications, donors could easily

circumvent the existing contribution limits by donating to the party instead.  *Colorado II*, 533

U.S. at 464 ("Coordinated expenditures of money donated to a party are tailor-made to

undermine contribution limits").  As has been well documented,[21] parties give large donors

privileged access to candidates.  Allowing unregulated coordinated expenditures for "own

speech" therefore leads to a heightened risk of circumvention and improper "quid pro quos"

between donors and candidates.  *Colorado II*, 533 U.S. at 464.

Despite these rather persuasive indications that coordinated communications can be

Constitutionally regulated, the plaintiffs' position is not frivolous.  In *Buckley*, the Supreme

---

[21]  *See* Findings of Fact Nos. 88 to 100, *supra.*

Court explained that contributions and expenditures are distinguishable because contributions are symbolic and do not convey the "underlying basis for the support." 424 U.S. at 21. Thus, where a coordinated expenditure explicitly conveys that underlying basis, it arguably becomes less symbolic and begins to look more like a "direct restraint on . . . political communication." *Id.* Because of this reasoning and because the Supreme Court has explicitly contemplated an analysis of this distinction, this Court finds that plaintiffs' questions raise issues that are not frivolous.

In addition to the legal argument above, the Cao plaintiffs also argue that the current coordination rules are functionally unworkable and prevent parties from actually expressing their own speech. They assert that there is no way for party officials–who are most familiar with the desired party message–to involve themselves in independent expenditures made legal in *Colorado I* because they are too intimately involved in candidates' campaigns. Under current rules, Cao argues, *any* involvement by those officials would be deemed coordinated, and subject to the contribution limits of the statute. (Rec. Doc. 77 at 31).[22]

Because the Court holds that the questions are not frivolous, it need not reach a conclusion regarding the functionality of the current legal distinction between independent party expenditures and coordinated party expenditures. The Court notes, however, that the Supreme Court has previously addressed similar arguments by political parties. In *Colorado II*, the political parties argued that coordination was necessary for the parties to operate effectively. The Supreme Court summarily rejected that argument: "[t]he assertion that the party is so joined at the hip to candidates that most of its spending must necessarily be coordinated spending is a

---

[22] *See* Findings of Fact Nos. 48 to 51, *supra.*

statement at odds with the history of nearly 30 years under the act. . . . For the Party to claim after all these years of strictly limited coordinated spending that unlimited coordinated sending is essential to the nature and functioning of parties is in reality to assert just that 'metaphysical identity' between free-spending party and candidate that we could not accept in *Colorado I*." 533 U.S. at 449-50 (quoting *Colorado I*, 518 U.S. at 623). Indeed, despite the allegedly unworkable current independent expenditure system, in the 2008 election cycle parties spent $280,873,688. (Biersack Decl. ¶ 11, Table 15, FEC Exh. 3). Further, up until 90 days before a congressional election and 120 days before a presidential election, party communications are not subject to the coordinated expenditure limit at all, unless the communication "disseminates, distributes, or republishes . . . campaign materials prepared by the candidate" or "expressly advocates the election or defeat of clearly identified candidates." (11 C.F.R. §§ 109.21(c)(2)-(3); 109.37).

Although the Court finds the substance of Questions Three and Six non-frivolous, the plaintiffs, in their briefing, put a much finer point on the questions than those originally proposed in the motion to certify. As such, the Court will exercise its discretion in fashioning a question for the Fifth Circuit that more precisely captures the Constitutional difficulty raised by the plaintiffs' arguments.

Thus, the Court certifies the following question to the Fifth Circuit:

Do the expenditure and contribution limits and contribution provision in 2 U.S.C. §§ 441a(d)(2-3), 441a(a)(2)(A), and 441a(a)(7)(B)(I) violate the First Amendment rights of one or more of plaintiffs as applied to coordinated communications that convey the basis for the expressed support?

The FEC's motion for summary judgment as to Questions Three and Six is DENIED.


*D.  Question 4 – The Constitutionality of Coordinated Expenditure Limits*

Plaintiffs' Question 4 challenges the constitutionality of the current coordinated

expenditure limits, in three parts:

> Do the limits on coordinated expenditures at 2 U.S.C. § 441a(d)(3)[23] violate the First
> Amendment rights of one or more plaintiffs?
>> (a) Do all but the highest limits violate such rights because any lower rates are
>> unsupported by the necessary anti-corruption interest?
>> (b) Is 2 U.S.C. § 441a(d)(3) facially unconstitutional because lower rates cannot
>> be severed from higher rates and the voting-age-population formula is
>> substantially overbroad and inherently unconstitutional?
>> (c) Is the highest limit for expenditures coordinated with Representatives
>> unconstitutionally low?"

(Rec. Doc. 19 at 2).  These will be addressed in turn.


> *i.  Plaintiffs' Argument that Lower limits cannot be Constitutionally Justified Under the*
*Anti-Corruption Rationale*

The Cao plaintiffs argue in this part that higher expenditure limits in some districts or for

---

[23]  2 U.S.C. § 441a(d):
Expenditures by national committee, State committee, or subordinate committee of State
committee in connection with general election campaign of candidates for Federal office .
. .

> (3) The national committee of a political party, or a State committee of a political
> party, including any subordinate committee of a State committee, may not make
> any expenditure in connection with the general election campaign of a candidate
> for Federal office in a State who is affiliated with such party which exceeds--
>> (A) in the case of a candidate for election to the office of Senator, or of
>> Representative from a State which is entitled to only one Representative,
>> the greater of--
>>> (i) 2 cents multiplied by the voting age population of the State (as
>>> certified under subsection (e) of this section); or
>>> (ii) $20,000; and
>> (B) in the case of a candidate for election to the office of Representative,
>> Delegate, or Resident Commissioner in any other State, $10,000.

some political offices logically preclude lower limits from being justified under the anti-corruption rationale. Put otherwise, they argue that it is unconstitutional to have a system that implies "that a Louisiana Senator can be 'bought' for a little more [than] a quarter million dollars but it takes more than two million dollar to 'buy' a California Senator." (Rec. Doc. 19-2 at 12).

Plaintiffs rely on a decision in Eastern District of California, *California Council Political Action Committee v. Scully*, 989 F. Supp 1282 (E.D.Cal. 1998) for their first argument. There, the court held that a California statute that imposed variable campaign contribution limits depending on whether candidates agreed to expenditure limits was not closely drawn, and violated the First Amendment. *Id.* at 1292, 1296.

The state financing system at issue in *California Prolife* is distinguishable from that established by § 441a(d)(3) because the California funding system created variable limits for the exact same candidate, depending on *her own choice*:

> The statute prohibits any person, broadly defined to include virtually any entity other than a political party and a small contributor committee (as defined by the statute), from contributing more than $100 per election in small local districts (less than 100,000 residents), $250 per election for Senate, Assembly, Board of Equalization and large local districts, and $500 per election for statewide office. Section 85301(a)-(c). These limits are increased to $250, $500 and $1,000, respectively, for candidates who agree to specified expenditure limits.

*Id.* at 1292 (footnote omitted). In this system, the same candidate could be subjected to two different contribution limits–one if they agreed to expenditure limits, and one if they did not. *Id.* at 1296. This difference led the court to conclude that the lower limit was not closely drawn to prevent corruption, because a candidate's choice to adhere to expenditure limits is a "constitutionally noncognizable condition[]." *Id.*

In contrast, the expenditure limit differences that result from § 441a(d)(3) do not occur

within the same race.  Rather, they vary with the office sought and size (in population) of the state.  As such, plaintiffs' reliance on *California Prolife* is not persuasive.  Nonetheless, the question remains whether Congress has discretion within the anti-corruption rationale to set variable limits to coordinated expenditure limits based on these criteria.

In *Davis v. FEC*, 128 S. Ct. 2759 (2008), the Supreme Court noted that its decision in *Colorado II* upheld the "facial constitutionality" of coordinated party expenditures.  *Id.* at 2771.  In striking down a provision of BCRA that applied different limits to candidates in the same race depending on whether one candidate reached a $350,000 threshold in personal spending, the Court noted that it has "never upheld the constitutionality of a law that imposes different contribution limits for candidates *who are competing against each other*."  *Id.* at 2770-71 (emphasis added).  Despite ample opportunity, the Court did not comment on the constitutionality of having different limits for candidates in different races.  Similarly, in *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 (2000), the Supreme Court was faced with a state campaign finance system that imposed variable contribution limits "depending on specified state office or size of constituency."  *Id.* at 382.  The statute at issue was challenged for setting unconstitutionally low limits.  *Id.* at 383.  Again, despite being squarely presented with statutes comparable in nature to § 441a(d)(3), the Court did not address, much less criticize, the notion that different limits could apply in different races and geographic regions.  *Id.* at 382-84; *see also Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (striking down unconstitutionally low limits in Vermont campaign finance law without addressing variable limits for different offices).

In *Buckley*, the Supreme Court held that the judiciary has "no scalpel to probe" each possible contribution level, 424 U.S. at 30 (quoting *Buckley v. Valeo*, 519 F.2d 821, 842 (D.C.

Cir. 1975)), and noted that such complex line drawing – which is "necessarily a judgmental decision" – is best left to congressional discretion. *Id.* at 83. It is legislators, not judges, who are best equipped with the "particular expertise" to assess what limits will adequately prevent corruption among their peers. *Randall*, 548 U.S. at 248.

Absent unconstitutionally low limits,[24] it is consistent with the anti-corruption rationale to allow Congress the discretion to set different coordinated expenditure limits in different races in different states. The Court therefore holds that the plaintiffs' Question 4(a) is frivolous.

### ii. *Plaintiffs' Argument on Severability*

Plaintiffs next argue that 2 U.S.C. § 441a(d)(3) is facially unconstitutional because lower rates cannot be severed from higher rates and the voting-age-population formula is substantially overbroad and inherently unconstitutional. The second part of this subpart – that the formula is overbroad and inherently unconstitutional – has already been addressed in Part i. The variable rate formula is constitutional. As such, the first part–that the lower rates cannot be "severed" from the higher rates – does not need to be addressed.

### iii. *Plaintiffs' Argument that the Highest Limits are Unconstitutionally Low*

The Cao plaintiffs argue that *Randall v. Sorrell*, 548 U.S. 230 (2006) stands for the proposition that low expenditure limits can be unconstitutional. They are correct. In *Randall*, the Court held that "limits that are too low can also harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." *Id.* at 249. In that case, the Vermont statute imposed the following contribution limits, not indexed for inflation: "The amount any single individual can

---

[24] *See* Part D.iii, *infra*.

contribute to the campaign of a candidate for state office during a 'two-year general election cycle' is limited as follows: governor, lieutenant governor, and other statewide offices, $400; state senator, $300; and state representative, $200." *Id.* at 238. After noting the Court's reluctance to second guess the Vermont legislature, it nonetheless held that when there is a "strong indication in a particular case, i.e., danger signs, that such risks [of harming the electoral process] exist (both present in kind and likely serious in degree)" it is the courts' duty to review the proportionality of the restrictions. *Id.* at 249. In the Vermont statute, the Court saw three such danger signs. First, the limits, adjusted for inflation, were well below those approved in *Buckley* ($57 per election compared to $1000 per election). *Id.* at 250. Second, the Vermont statute imposed the lowest contribution limits in the nation. *Id.* at 250-51. Finally, the limit was lower than the lowest limit previously upheld by the Supreme Court, $1075 for Missouri state auditor. *Id.* at 251.

However, the Cao plaintiffs have not presented any evidence that would lead the Court to question the current expenditure limits. Although the Cao plaintiffs argue otherwise (Rec. Doc. 77 at 41-42), it is the candidate's speech that is affected by the magnitude of the contribution limits, and it is the ability of the candidate to speak effectively that the Court must safeguard. *See Buckley*, 424 U.S. at 21 ("contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy"); *Shrink*, 528 U.S. at 397 ("We asked, in other words, whether the contribution limitation was so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless").

Thus, the warning signs suggest in *Randall* are not present here. Indeed, the *Randall* decision reaffirmed that the limits approved in *Buckley*, far from being constitutionally suspect, should be used as a benchmark. *Id.* at 250. The FEC has presented ample evidence that Cao was able to secure significant funding for his campaign,[25] and Cao has not countered with any evidence that the effect of Cao's political speech was weakened by lack of resources.

The Court therefore DENIES the Cao plaintiffs' Motion to Certify Question 4, in its entirety, and GRANTS the FEC's motion for summary judgment.

*E. Question 7 – Whether the $5000 Contribution Limit in 2 U.S.C. § 441a(2)(A) is Unconstitutional because it Imposes the same Limits on Parties as it does Political Action Committees*

The Cao plaintiffs next argue that 2 U.S.C. § 441(a)(2)(A),[26] is "per se unconstitutional" because it imposes the same limit on parties that it does on political action committees (PACs). In support, the Cao plaintiffs again rely primarily on *Randall v. Sorrell*, 548 U.S. 230 (2006). In striking down Vermont's campaign finance statute, the *Randall* court noted that the statute's "insistence that political parties abide by *exactly* the same low contribution limits that apply to other contributors threatens harm to a particularly important political right, the right to associate in a political party." *Id.* at 256 (emphasis in original).

---

[25] During the 2008 cycle, then-candidate Cao's congressional campaign had receipts of $242,531. As of June 30, 2009, he had reported $516,957 in total receipts. (Biersack Decl. ¶ 16, Table 23, FEC Exh. 3)

[26] 2 U.S.C. § 441a:
(a) Dollar limits on contributions
    (2) No multicandidate political committee shall make contributions--
        (A) to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000

Such a restriction is constitutionally problematic because it diminishes the benefits that parties seek to obtain by pooling the collective resources of their members.  Thus, the *Randall* court was concerned that contribution limits that failed to distinguish between parties and individuals demonstrated that the Vermont legislature had not balanced "the need to allow individuals participate in the political process by contributing to political parties that help elect candidates with . . . the need to prevent the use of political parties 'to circumvent contribution limits that apply to individuals." *Id.* at 258 (quoting *Colorado II*, 533 U.S. at 453).  This shortcoming in the statute "prevent[s] a political party from using contributions by small donors to provide meaningful assistance to any individual candidate." *Id.* at 258.  Although the Supreme Court in that case raised the associational rights concern as one among a host of flaws that ultimately caused the Court to hold that the Vermont statute was unconstitutional, *id.* at 253, that it was one among many does not reduce the validity of the constitutional deficiency.

The provision at issue in this case raises many of the same problems, though in a slightly different context.  The Cao plaintiffs complain not that the provision in the Act treats parties identically to the way it treats individuals, as was the concern in *Randall*, but rather that it does not distinguish between parties and PACs.

Political parties occupy a unique role in American politics.  A primary goal of all the major political parties is to win elections.  "The ultimate goal of a political party is to get as many party members as possible into elective office, and in doing so to increase voting and party activity by average party members."  (Meehan Decl. at ¶ 5, FEC Exh. 2).  "In practice, electing … candidates is the RNC's primary focus."  (*McConnell*, 251 F. Supp. 2d at 470 (Kollar-Kotelly, J.)).  *See also Randall*, 548 U.S. at 257-58 ("[individuals contribute] with the intent that party

use its money to help elect whichever candidates the party believes would best advance its ideals and interests – *the basic object of a political party*") (emphasis added). Senator McCain testified**,** in connection with the *McConnell* litigation, that "[t]he entire function and history of political parties in our system is to get their candidates elected, and that is particularly true after the primary campaign has ended and the party's candidate has been selected." (McCain *McConnell* Decl. ¶ 23 [DEV 8-Tab 29], FEC Exh. 51).

In contrast, PACs are "most concerned with advancing their narrow interests and therefore provide support to candidates who share their views, regardless of party affiliation." *Colorado II*, 533 U.S. at 451 (internal quotes omitted). Indeed, many PACs contribute to both of the major national parties in the same election cycle, under the belief that donating to a party "helps you legislatively." *Id.* at 452 n.12. "Parties are thus necessarily the instruments of some contributors whose object is not to support the party's message or to elect party candidates across the board, but rather to support a specific candidate for the sake of a position on one narrow issue, or even to support any candidate who will be obliged to the contributors." *Id.* at 451-52. Parties, therefore, are funded by groups and individuals with many and varying interests. The unique purpose of parties, as compared to other political associations like PACs, arguably entitles it to heightened constitutional protection.[27]

---

[27] The FEC argues that political parties' statutory advantages compared to PACs should lead the Court to the conclusion that applying equal contribution limits is constitutionally permissible. (Rec. Doc. 65 at 50). Although it is true that parties, unlike PACs, are permitted to make coordinated expenditures, 2 U.S.C. § 441a(d)(3), and have other comparative advantages (Rec. Doc. 65 at 50), this is equally an argument for why political parties are inherently different from PACs and should not be tied to the same contribution limits. Further, given the low threshold for certifying questions to the Fifth Circuit, this Court is not in a position to weigh the relative advantages of the various provisions within the Act.

The FEC argues that the Supreme Court foreclosed this question in *Buckley* and in *Colorado II*. It did not. The cited portion of *Buckley* mentioned the predecessor to § 441a(2)(A), but did so only in the context of discussing ad hoc political groups as opposed to "established interest groups." 424 U.S. at 36. Political parties were not mentioned, nor was the constitutionality of undifferentiated limits. Similarly, the portion of *Colorado II* cited by the FEC dealt exclusively with coordinated expenditures, not contributions. 533 U.S. at 448-49. As has been thoroughly discussed above, contributions and expenditures require distinct constitutional analysis. In fact, the *Colorado II* court suggested that parties might warrant additional constitutional protections, but declined to address the question. "There is some language in our cases supporting the position that parties' rights are more than the sum of their member's rights, *e.g.*, *California Democratic v. Jones*, 530 U.S. 567, 575 (2000) (referring to the 'special place' the First Amendment reserves for the process by which political party selects a standard bearer); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 373 (1997) (Stevens, J., dissenting), but we have never settled upon the nature of any such difference and have no reason to do so here." *Colorado II*, 533 U.S. at 448 n.10. This acknowledgment by the high court that parties may possess uniquely protected associational rights is sufficient for this Court to hold that Question 7 is non-frivolous.[28]

---

[28] Plaintiffs' argument that parties cannot corrupt their own candidates is not persuasive. (Rec. Doc. 62 at 28). The cases cited do not support such a claim, and the *Colorado II* court noted that among the motives that contributors may have in donating to a political party is "to support any candidate who will be obliged to the contributors." 533 U.S. at 452. The Court sees no reason why this would not apply equally to parties. Regardless, plaintiffs' corruption interest argument is not essential to the issue they raise regarding the constitutionality of the contribution limits.

*F.  Question 8 – Whether 2 U.S.C. § 441a(a)(2)(A) Facially Violates the First Amendment Rights of the Plaintiffs*

Finally, plaintiffs' Question 8 raises the issue whether the $5,000 contribution limit in § 441a(a)(2)(A) facially violates the First Amendment rights of any of the plaintiffs.  They raise three challenges, addressed in turn below.

*(a) The limit is not adjusted for inflation, creating multiple lower contribution limits in years after passage of the statute and thereby vitiating any anti-corruption interest in all but the highest limit.*  (Rec. Doc. 19-2 at 16)

The Cao plaintiffs first argue that because the contribution provision is not indexed to inflation, and remains at the same level, $5000, as it was in 1976 when *Buckley* initially addressed the FECA, it can no longer be justified as necessary under the anti-corruption interest.  (Rec. Doc. 19-2 at 16).  In *Randall*, the Supreme Court held that a failure to index to inflation can be constitutionally significant: "[a] failure to index limits means that limits which are already suspiciously low will almost inevitably become too low over time."  548 US at 261.

The *Randall* court found the Vermont statute constitutionally infirm after examining five areas in which the statute was suspect and concluding that "*[t]aken together*" the act was not closely drawn.  *Id.* at 253 (emphasis in original).  Thus, failure to index, taken on its own, is certainly not fatal to a campaign finance statute.  Indeed, the *Buckley* court approved unindexed limits in 1976.  *See* 424 U.S. at 35.  Further, there is no evidence that the challenged limits were "suspiciously low" in 1976.

However, as the Cao plaintiffs point out, $5000 in 1976 is nearly $19,000 in today's terms.  (Rec. Doc. 77 at 48) (applying the U.S. Department of Labor Inflation Calculator).  Assuming that the $5000 limit was based on a Congressional determination about corruption, legislative inactivity for thirty years presents a valid basis for a facial challenge – if Congress

determined that $5,000 in 1976 was the proper balance of political expression and prevention of corruption, arguably that limit must approach $19,000 today, and $5,000 might be unconstitutionally low.  The Court therefore finds Question 8(a) to be non-frivolous.

*(b) The additional $35,000 that may be contributed to candidates for Senator, 2 U.S.C. § 441a(h) (adjusted for inflation to $39,900, 73 Fed. Reg. 8698), creates disparate limits so that (i) the higher limit as to candidates for Senator vitiates the anti-corruption interest as to any lower amount for candidates for Senator and (ii) the higher limit as to candidates for Senator also vitiates the anti-corruption interest as to any lower amount for candidates for Representative.* (Rec. Doc 19-2 at 16).

The Cao plaintiffs next argue that the provision in 2 U.S.C. § 441a(h) that allows parties to contribute an additional $35,000 (now adjusted to $39,900) to candidates for Senate vitiates the anti-corruption interest of any lower limits for either Senators or Representatives.  As discussed in Part D.i, *supra*, the Court does not find these arguments persuasive.  Complex line drawing regarding the anti-corruption interest is "necessarily a judgmental decision" best left to congressional discretion.  *Buckley*, 424 U.S. at 83.  The Court finds this subpart of Question 8 to be frivolous.

*(c) The limit is simply too low to allow political parties to fulfill their historic and important role in our democratic republic.*  (Rec. Doc. 19-2 at 16).

Lastly, the Cao plaintiffs argue that the $5,000 contribution limit in 2 U.S.C. § 441a(a)(2)(A) is too low to allow political parties to "fulfill their historic and important role in the democratic republic."  (Rec. Doc. 19-2 at 16).  Much like their argument in Question 4, that the coordinated expenditure limit in 2 U.S.C. § 441a(d)(3) is unconstitutionally low, the plaintiffs make this suggestion without providing evidence to support the claim.  As to Question 4, the Court held that the determination of whether the limits are too low must be made by reference to the *candidate's* ability to engage in political speech.  In rejecting the claim, the

Court noted the evidence in the record indicating that Representative Cao raised significant funds in the recent election cycles.

Here, however, the Cao plaintiffs more plainly emphasize the effect on the party itself, suggesting that the party is somehow unable to function under the current contribution limits. They quote *Randall* for two arguments in support of this claim: 1) that low limits limit the ability of a party to "assist its candidate's campaigns" and 2) that low limits "hinder the need to allow individuals to participate in the political process by contributing to political parties." (Rec. Doc. 19-2 at 18) (quoting *Randall*, 548 U.S. at 257).

Again, the facts presented belie the Cao plaintiffs' unsupported arguments. In the 2008 election cycle, parties supported their federal candidates with a total of $529,262 in contributions, $31,256,379 in coordinated expenditures, and $54,563,499 in independent expenditures. (Biersack Decl. ¶¶ 8, 12, 15, Tables 6-9, 16, FEC Exh. 3). If the limits are hindering the parties' ability to support candidates, that evidence is not before the Court, and the plaintiffs have not provided any legal arguments that would support certifying this question for the Fifth Circuit.

The Court therefore holds that Question 8, subpart c is frivolous.


**V. Conclusion**

Accordingly,

IT IS ORDERED that plaintiffs' Motion to Strike (Rec. Doc. 78) is DENIED. Plaintiffs' Motion to Certify (Rec. Doc. 19) is GRANTED IN PART. The following questions are to be certified to the *en banc* panel of the Fifth Circuit Court of Appeals:

1)  Has each of the plaintiffs alleged sufficient injury to constitutional rights enumerated in the following questions to create a constitutional "case or controversy" within the judicial power of Article III?

2)  Do the expenditure and contribution limits and contribution provision in 2 U.S.C. §§ 441a(d)(2-3), 441a(a)(2)(A), and 441a(a)(7)(B)(i) violate the First Amendment rights of one or more of plaintiffs as applied to coordinated communications that convey the basis for the expressed support?

3)  Does the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) violate the First Amendment rights of one or more plaintiffs as applied to a political party's in-kind and direct contributions because it imposes the same limits on parties as on political action committees?

4)  Does the $5,000 contribution limit at 2 U.S.C. § 441a(a)(2)(A) facially violate the First Amendment rights of one or more plaintiffs because it is not adjusted for inflation?

IT IS FURTHER ORDERED that defendant's Motion for Summary Judgment (Rec. Doc. 69) is granted as to all remaining claims.

Plaintiff LA-GOP does not have standing to bring the certified questions before the *en banc* panel.  Those questions remain before the Court.


New Orleans, Louisiana, this 27th day of January, 2010.



HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE